## COMMONWEALTH *vs.* A JUVENILE.

Bristol.    February 6, 1974. — June 12, 1974.

Present TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Evidence,* Polygraphic test; Opinion: expert; Judicial discretion.    *Constitutional Law,* Self-incrimination.    *Practice, Criminal,* Mistrial, Judicial discretion, Variance.

The results of a polygraph, or "lie detector," test administered by means of a polygraph machine to a defendant in a criminal case who has agreed in advance to their admission in evidence regardless of their outcome may be admitted in the discretion of the trial judge, to be considered with all the other evidence, and not as binding or conclusive evidence, after he has made sure that the constitutional rights of the defendant will be fully protected and has made a close and searching inquiry into the qualifications of the examiner who administered the test, the fitness of the defendant for the examination, and the methods used in conducting the test. [423-426] QUIRICO, J. dissenting, with whom REARDON and KAPLAN, JJ., joined. KAPLAN, J., dissenting, with whom REARDON and QUIRICO, JJ., joined.
Some guidelines stated for court procedure to be followed after the filing by the defendant in a criminal case of a motion to be allowed to submit to a polygraph test, and to be followed, if the motion is allowed, before the trial judge admits the results of the test in evidence. [429-432]
A defendant in a criminal case, by selecting or agreeing to the selection of an expert to administer to him a polygraph test, does not preclude himself from cross-examining that expert upon admission of his testimony in evidence when offered by the Commonwealth. [432]
At a murder trial, testimony of the medical examiner who performed the autopsy as to the position of the victim's body at the time of the insertion therein of the knife blade which the examiner believed could have caused the death was properly admitted. [436-437]

At a trial for murder, where there was evidence that the crime was committed by the blade of a knife without a handle, and a blade similar in size and shape but with a handle affixed was admitted in evidence as an exhibit without objection, the opinion of a medical expert that if the murder blade had had such a handle it could have caused the death of the victim was properly admitted. [437-438]

There was no reversible error in a murder case in the denial of a motion for a mistrial on the ground of an improper remark by the victim's father on the witness stand which was immediately struck by the trial judge, who instructed the jury with clear and forceful language not to consider the remark. [438-439]

There was no error at a murder trial in allowing a young friend of the juvenile defendant to testify that the defendant appeared "scared" on the evening of the murder. [439]

At the trial of a complaint under G. L. c. 265, § 1, for murder by stabbing "with a Grant Maid Stainless U.S.A. table knife," where the blade of such a knife was introduced in evidence and before the charge the defendant requested a specific instruction that the jury must find beyond a reasonable doubt that the particular blade specified in the complaint had actually caused the victim's death, the judge correctly denied the request. [439-440]

COMPLAINT received and sworn to in the Fourth District Court of Bristol on April 13, 1970.

Following an appeal to and trial in the Superior Court and the decision of this court reported in 361 Mass. 214 (1972) motions by the defendant respecting polygraphic tests were denied by *Taviera,* J., and a second trial of the case was before him.

*Rudolph F. Pierce* (*Charlotte A. Perretta* with him) for the defendant.

*Mary A. McLaughlin,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J.    This is an appeal pursuant to G. L. c. 278, § 33B, following a Superior Court jury verdict that the appellant, a juvenile, is a delinquent by reason of manslaughter. The facts are essentially those recited in our previous decision in this case.[1]

---

[1] At the previous trial there was a jury verdict of delinquency by reason of murder in the second degree which was vacated by us in *Commonwealth* v. *A Juvenile,* 361 Mass. 214 (1972).

Six grounds for reversal were argued. We will deal first with the issues surrounding the trial judge's denial of the juvenile's pre-trial motions for the admission of polygraph, or "lie detector" test results. From the record it is clear that substantial advances have been made in the field of polygraphy since we rejected the admission of such evidence in *Commonwealth* v. *Fatalo*, 346 Mass. 266 (1963).

I.

In a written motion to the trial court, the juvenile stated that on May 26, 1970, a polygraph examination was administered to him by two polygraph experts of his own choosing, and that the results indicated that he was telling the truth when he denied having caused, directly or indirectly, the death of the victim in this case. He wished to "offer testimony of qualified experts at trial to demonstrate the scientific reliability of the polygraph, the scientific acceptability of the polygraph with particular attention to the increased acceptability of the polygraph since 1963 when its admissibility was last ruled on by the Supreme Judicial Court . . . *Commonwealth* v. *Fatalo*, 346 Mass. 266, the manner in which the test was administered to the defendant, the physiological, psychological, and technological manner in which the test is effective, and the opinion of the test examiners and the specific basis for the opinion, regarding the truthfulness of defendant's answers to questions which are extremely relevant to the case in that they relate to the substance of the crime alleged by the complaint against the defendant." Attached to the motion were three memorandum opinions by trial courts, two Federal and one State, allowing polygraph results in evidence in criminal cases. *United States* v. *Ridling*, 350 F. Supp. 90 (E. D. Mich. 1972). *United States* v. *Zeiger*, 350 F. Supp. 685 (D. D. C. 1972), revd. 475 F. 2d 1280 (D. C. Cir. 1972). *People* v. *Cutler* (Superior Ct. of Cal. for L. A. County, November 6, 1972) (unreported).

The trial judge conducted a preliminary hearing at which the juvenile introduced the expert testimony described in his written motion. At the conclusion of the hearing, the juvenile made a supplemental oral motion requesting that the court order an additional polygraph examination by a court appointed examiner, whose results would be admissible together with or independent of those of the juvenile's expert, or that the Commonwealth be ordered to conduct an examination by an expert of its own choosing, and have those results admissible together with those of the juvenile's expert.

The trial judge denied the juvenile's motions, with expressed reluctance. He said, "Polygraphic tests are now generally and widely accepted in the scientific community. The machine has proven to be a reliable instrument for detecting deception. Since the year 1963, polygraphic testing has become more reliable, and scientific acceptance thereof has increased. Advances have been made both to the machine itself and in the ways of administering the test. When conducted by competent polygraph examiners under proper examination conditions, polygraphic testing possesses a high degree of reliability and scientific acceptability. [The] polygraphic test of the juvenile was conducted by a qualified and highly competent polygraph examiner. Notwithstanding the foregoing findings and though counsel has cited some instances where the results of polygraphic tests have been admitted into evidence, I am not convinced that the courts in general have given widespread acceptance to this type of evidence, nor is there any indication that state legislatures have passed legislation permitting such tests or the results thereof as evidence. In any event, I do not feel that a favorable determination of the admissibility, if indeed it is warranted, should be made in the first instance by the trial judge. If any change in this direction is at all indicated, then it is a matter that is better left to an appellate court, particularly where our Supreme Judicial Court has already expressed its views regarding the acceptability of this type of evidence . . . . In conclusion,

the written motion and the supplemental oral motion . . . [are] denied.''

It is evident that the judge was convinced of the polygraph's reliability and evidentiary value but felt that as a trial judge he should wait for our prior approval before admitting such evidence. In *Commonwealth* v. *Fatalo*, *supra*, we held that the results of polygraph tests were not admissible as evidence in a criminal case because the test had not yet achieved general acceptance by the scientific community as a reliable method for determining whether an individual is telling the truth. While not establishing universal scientific approval of a demonstration of infallibility as prerequisites to admissibility of polygraph test results, we felt that the results could not be admitted until the "substantial doubts which presently revolve about the polygraph test" were resolved. 346 Mass. at 270. The juvenile, in attacking the validity of the trial judge's denial of his motions, asserts that developments in the field of polygraph testing since the *Fatalo* case and the recent acceptance of polygraph results as evidence by a few trial courts, demonstrate that the doubts which troubled us in 1963 can no longer be called substantial enough to deny admissibility to the results of tests conducted on a criminal defendant by experts under proper conditions. We do not accept that argument in full force. Although we acknowledge that these scientific and legal developments indicate that the polygraph is making progress in a hoped for evolution toward complete evidentiary recognition, we nevertheless are unwilling to say at this time that the standard in the *Fatalo* case has been met and that the polygraph test results should henceforth be subject to the same rules of evidence applicable to other forms of acceptable expert scientific evidence. We do, however, think that polygraph testing has advanced to the point where it could prove to be of significant value to the criminal trial process if its admissibility initially is limited to carefully defined circumstances designed to protect the proper and effective administration of criminal justice. Accordingly, we hold for

reasons stated below that if a defendant agrees in advance
to the admission of the results of a polygraph test regardless
of their outcome, the trial judge, after a close and searching
inquiry into the qualifications of the examiner, the fitness
of the defendant for such examination, and the methods
utilized in conducting the tests, may, in the proper exercise
of his discretion, admit the results, not as binding or
conclusive evidence, but to be considered with all other
evidence as to innocence or guilt. As a prerequisite the
judge would first make sure that the defendant's con-
stitutional rights are fully protected.

Engaging at this point in an exhaustive and lengthy
treatment of the subject of polygraphy would to a large
extent be but a rehash of what has already been effectively
said elsewhere.[2] We will instead, based mainly on the
testimony before the trial judge, limit ourselves to a
discussion of the polygraph and the associated scientific
and legal problems to the extent it is necessary to explain
the conclusions reached by us. The polygraph machine is a
scientific device which through measurement and record-
ing of involuntary bodily responses — blood pressure, pulse
rate, respiration, and skin resistance to electricity — seeks
to determine whether an individual is telling the truth. The
fundamental assumptions of polygraphy are that (1) there
is a regular relationship between lying and emotional states
and (2) there is a regular relationship between these
emotional states and measurable physiological changes in
the body. See Skolnick, Scientific Theory and Scientific
Evidence: An Analysis of Lie-Detection, 70 Yale L. J. 694,
700 (1961). In short, the polygraph machine is said to be
capable of determining an individual's subjective state of

---

[2] See, e.g., *United States* v. *DeBetham*, 348 F. Supp. 1377 (S. D. Cal. 1972),
affd. 470 F. 2d 1367 (9th Cir. 1972), cert. den. 412 U. S. 907 (1973); *United States* v.
*Ridling*, 350 F. Supp. 90 (E. D. Mich. 1972); *United States* v. *Zeiger*, 350 F. Supp.
685 (D. D. C. 1972), revd. 475 F. 2d 1280 (D. C. Cir. 1972); *State* v. *Valdez*, 91 Ariz.
274 (1962). Helpful commentaries include Reid and Inbau, Truth and Deception
(1966); Kaplan, The Lie Detector: An Analysis of its Place in the Law of Evidence,
10 Wayne L. Rev. 381 (1964); Skolnick, Scientific Theory and Scientific
Evidence: An Analysis of Lie-Detection, 70 Yale L. J. 694 (1961); note, 20 Drake L.
Rev. 330 (1971); note, 53 B. U. L. Rev. 375 (1973).

mind through analysis of objective criteria which cannot be manipulated by the individual.

Equal to the importance of the machine itself is the competence, experience, and education of the test examiner. "[I]t is the examiner who must screen out the 'unfit' examinee, conduct the important pre-test interview (which is essential to the proper preparation of the actual test questions), and supervise the environment of the test to eliminate possible distortive influences, as well as ask the questions and interpret the resulting polygrams." *United States* v. *DeBetham*, 348 F. Supp. 1377, 1385 (S. D. Cal. 1972).[3] Overall, the training and background of polygraph examiners have become more sophisticated in recent years, and the "practice has acquired the usually accepted indicia of a profession, such as a national professional organization, training schools, qualification standards, yearly seminars, and specialized publications." *United States* v. *Zeiger, supra*, at 688. Nevertheless, as a profession, polygraphy has yet to achieve a uniform minimum level of competence. As one court said, "[T]he polygraph, the theory, the technique and the hardware seem to have outstripped the general acceptance of polygraph personnel in development. Although the profession of polygraph experts is becoming standardized and professionalized, it has not yet developed adequate ways and means to police itself. Although the profession has adopted a code of ethics and machinery exists in the professional organization to discipline the unqualified and unethical, the chance of serious impropriety on the part of polygraph examiners must be considered." *United States* v. *Ridling, supra*, at 96.

Notwithstanding the present inconsistencies in abilities to be found among examiners as a whole, increasing numbers of individuals are receiving the type of training necessary to prepare them for this role. Moreover, the equipment itself has undergone technical refinements. As

---

[3] See also Reid and Inbau, at 4 (fn. 2, *supra*), who consider "the ability, experience, education, and integrity of the examiner" to be "the most important factor" involved in the use of any polygraph.

Commonwealth v. A Juvenile.

these developments have coincided, polygraph testing has come to be regarded as reliable in a growing number of circles, governmental, scientific, legal and private.[4] In what must be regarded as one of the leading studies on the question of polygraph reliability, the authors, who had earlier recommended against the use of polygraph results as evidence, concluded that while "[w]e profess no infallibility for the Polygraph technique . . . we can sincerely report it to be a very reliable aid in the determination of truth or deception." Reid and Inbau, Truth and Deception (preface) (1966). The percentage of known errors with the technique in the laboratories of John E. Reid and Associates is "less than 1 per cent. Of the remainder no diagnosis at all is attempted in about 5 per cent of the cases, because of such factors as the physiological or psychological impairment of the subjects." Id. at 234. But since this and other similar studies[5] were conducted under optimum conditions by highly sophisticated examiners, they cannot be seen as wholly accurate predictions of test results in general, where there are many variables involved, most notably in the sophistication of the examiners. Additionally, besides these essentially practical problems, there still remains in certain portions of the scientific community resistance to polygraphy's basic assumptions as to the relationship between lying and certain emotional states, and the relationship of those emotional states to measurable physiological changes in the body. See Skolnick, supra; Heckel and others, Polygraphic Variations in Reactivity between Delusional, Non-Delusional, and Control Groups in a "Crime" Situation, 53 J. of Crim. L., Criminology and Police Science, 380 (1962). These assumptions are disproved to a certain extent by the undisputed fact that some persons

---

[4] See Reid and Inbau, at 226-232 (fn. 2, supra).

[5] Horvath and Reid, the Reliability of Polygraph Examiner Diagnosis of Truth and Deception, 62 J. of Crim. L., Criminology and Police Science, 276 (1971). Raskin, An Experimental Study of Field Techniques in "Lie Detection," in Zimmerman, The Polygraph in Court, at 94 (1972).

can tell undetectable lies, e.g., pathological liars, emotionally unresponsive subjects who have rationalized their behavior, children with an active imagination unable to distinguish between reality and fantasy, and others. See Highleyman, The Deceptive Certainty of the "Lie Detector," 10 Hastings L. J. 47 (1958). Floch, Limitations of the Lie Detector, 40 J. of Crim. L., Criminology and Police Science, 651 (1950).

In sum, despite very significant progress in recent years, the field of polygraphy is still challenged forcefully on theoretical grounds and has yet to achieve a predictable level of consistency among examiners. For these reasons we do not believe that at this time polygraph test results should be generally admissible in evidence in criminal trials. *Commonwealth* v. *Fatalo, supra.* Yet we cannot ignore completely the potential value of polygraph testing (when requested by the defendant as stated above) as an aid to determining whether an individual is telling the truth when conducted by an examiner found to be well qualified in all aspects of testing and in the screening of the subject.

We believe that the proper determination of reliability and competence of examiners can be achieved through close scrutiny by the trial judge of an examiner's qualifications, and by requiring the defendant to agree in advance (with all proper safeguards) to the admissibility of the results of a polygraph test. Dealing first with the question of examiner qualification, we do not think it wise at this time to limit the trial judge's discretion on matters of expert testimony by formulating strict minimum standards as prerequisites to qualification of polygraph experts,[6] but we wish to emphasize that in light of the crucial importance of the examiner's ability in relation to the

[6] Reid and Inbau, for example, suggest that a polygraph expert should have the following credentials before being permitted to testify: (1) a college degree; (2) at least six months of internship training under an experienced, competent examiner or examiners with a sufficient volume of case work to afford frequent supervised testing in actual case situations; (3) five years' practical experience. Truth and Deception, *supra*, at 257 (1966).

polygraph's reliability, it is essential that the trial judge exercise a high degree of care in assessing an examiner's credentials. Special attention should be given to an examiner's experience, a factor which is at least as important as the amount and type of formal training. By way of illustration, we think that the expert offered by the defendant in this case is amply qualified,[7] though we do not wish to be understood as saying that his credentials establish minimum standards for qualification. It is the combination of training, experience, and demonstrated ability that should be determinative.

Secondly, we believe that in view of the possibly damaging consequences of an agreement to admit the results of a yet to be taken polygraph examination, a defendant who has entered into such an agreement may be highly motivated to assure that the examiner is well qualified and that the test is conducted under proper conditions. Of course it is possible that in some cases a defendant might select an examiner with minimal qualifications on the assumption that he could be more easily discredited if the results are adverse to him. We think, however, that the trial judge's power to rule on an examiner's qualifications, especially in light of our expressed concern for demonstrated excellence, effectively minimizes such a possibility.

There are four situations within this framework for admissibility which we consider to come within the judge's discretion: (1) where the defendant moves that he be allowed to submit to an examination conducted by an examiner of his own choosing; (2) where the defendant moves that he be allowed to submit to an examination

---

[7] Charles Zimmerman was trained in polygraph techniques while serving in the United States Army under a Department of Defense Program. Subsequently, he served for five years as a polygraph examiner at the Military Police Crime Laboratory. Thereafter he was an adviser for lie detection to the Headquarters, European Command for the United States Army. While in this capacity, he conducted polygraph tests for the CIA, CIC, CID and Interpol. He has lectured at various universities on the polygraph, and participates regularly in various seminars and refresher courses. He is the author of four works on the polygraph. Throughout his career, he has performed between 22,000 and 30,000 polygraph examinations.

adminstered by an expert chosen by the Commonwealth; (3) where the defendant moves to be allowed to submit to an examination conducted by a jointly selected examiner, or by examiners designated by the defendant and by the Commonwealth; or (4) where the defendant moves that the court appoint an examiner. In all four instances, the defendant would agree in advance that the results would be admissible irrespective of the outcome of the tests.[8] Once an acceptable motion has been made and is allowed by the court, after written findings as to the voluntariness and understanding by the defendant, the test can be administered. Before admitting the results, the judge should engage in the type of voir dire inquiry we have referred to above. After making appropriate findings, he may then, in his discretion, admit the examiner's testimony concerning the test results as evidence to be considered with all other evidence. The Commonwealth would, of course, be entitled to a copy of the polygraph test results.

Here it is important to emphasize the relationship between our holding and the defendant's Fifth Amendment to the United States Constitution right against self-incrimination, and its waiver. The polygraph results are essentially testimonial in nature and therefore a defendant could not be compelled initially to take such an examination on the Commonwealth's motion.[9] Thus, if the defendant on his own initiative requests an examination

---

[8] In the instant case, the juvenile was aware of the favorable polygraph results before making his motion. He would therefore be restricted to options (2), (3), and (4) unless he makes a new selection of another expert and agrees in advance to the admissibility of the test results.

[9] See *Schmerber* v. *California*, 384 U. S. 757, 764 (1966), where the court, in dicta, offered these very pertinent remarks: "There will be many cases in which ... [the distinction between testimonial evidence and real or physical evidence] is not readily drawn. Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege 'is as broad as the mischief against which it seeks to guard,' *Counselman* v. *Hitchcock*, 142 U. S. 547, 552." See also *Bowen* v. *Eyman*, 324 F. Supp. 339 (D. Ariz. 1970); note, 53 B. U. L. Rev., *supra*, at 392-396 (1973).

and agrees (knowingly and with understanding) to the admission of the results regardless of outcome, he has to that extent waived his Fifth Amendment rights. Therefore, as we have previously indicated, before granting a defendant's motion that he be allowed to submit to a polygraph examination, the court must inform him of his constitutional rights. Next, if the defendant wishes to waive that right, the court must assure (with appropriate findings) that the waiver is made "voluntarily, knowingly and intelligently."[10]

Another important question concerns the right of cross-examination. We wish to make it clear that by selecting or agreeing to an expert to administer a polygraph examination, a defendant does not in any way preclude himself from cross-examining that expert if his testimony turns out to be unfavorable to the defendant's position when the expert's testimony is offered by the Commonwealth. Moreover, the possibility of vigorous cross-examination by a defendant in this context, in addition to protecting a defendant's basic right to confront witnesses against him, may serve as an incentive for an examiner to make every effort to assure that his examination is properly and thoroughly conducted. In this regard we think it important that both parties, depending on the outcome of the polygraph results and by whom the expert is called as a witness, have an equally broad scope of cross-examination available to them at trial regardless of who originally selected the expert.

Professor Wigmore has stated that "[i]f there is ever devised a psychological test for the valuation of witnesses, the law will run to meet it." Wigmore, Evidence (2d ed.) § 875 (1923). Admittedly, our holding today (rather than "running to meet it") is but a cautious first step toward the acceptance of polygraph testing. The guidelines we have laid down are not intended to be all inclusive. The benefit of time and the experience gained under the new practice we

---

[10] *Miranda* v. *Arizona*, 384 U. S. 436, 444 (1966).

have established may, in the future, indicate the desirability of a more detailed and comprehensive set of court rules in the area of polygraphy testing and the admissibility of its results in evidence. In view of the extensive debate and controversy which still exist as to the use of polygraphy as an aid to the truth-finding function of the courts, we believe that further learning, experimentation and experience are necessary before more comprehensive and all encompassing rules are considered for adoption.

On the record before us it is clear that the defendant's motions concerning polygraph tests were not denied by the trial judge as a matter of discretion but rather as a ruling of law.[11] In any event, the defendant is entitled to the benefit of the doubt on this score, especially when it is remembered, as we noted in the first appeal, *supra*, that the case against him is "very largely circumstantial." The defendant may file within thirty days a motion for a new trial in the Superior Court. The motion for a new trial will be limited to and dependent on the single issue of whether the judge will allow, as a matter of discretion, consistent with our holdings, the defendant's motion for a polygraph test. See *Earl* v. *Commonwealth*, 356 Mass. 181 (1969).

## II.

In the circumstances, following established precedent in the United States Supreme Court, and in this connection speaking for myself and not necessarily for the concurring Justices, I believe it is appropriate to make brief comment on the dissenting opinions. They show unusual and pre-

---

[11] Justice Quirico's dissent argues the contrary on the basis of a truncated version of the trial judge's ruling denying the juvenile's motion. With all deference, that excerpt does not reveal the full character of the judge's position. Other more pertinent remarks clearly indicate that the judge was personally convinced that the juvenile had established a very convincing case for the admission of polygraph results ("When conducted by competent polygraph examiners under proper examination conditions, polygraphic testing possesses a high degree of reliability and scientific acceptability. [The p]olygraphic test of the juvenile was conducted by a qualified and highly competent polygraph

mature concern about alleged problems which time may resolve. From Justice Quirico's dissent one might conclude that the trial courts will immediately be overwhelmed with polygraph testimony. I do not believe this will happen. Only under sharply defined and limited circumstances and conditions may the trial judge, in his discretion, permit such evidence to be admitted. It is reasonable to suppose that a careful and experienced judge will consider the admission of the evidence, in a very close case,[12] when unusual facts and circumstances warrant such a procedure, and in the interests of justice. It is also reasonable to conclude that such circumstances will not arise with great frequency.

Both Justices Quirico and Kaplan urge that the entire matter be sent to a commission for study. The analogy made to the recent study of civil rules of procedure is, indeed, mixing apples with oranges. The civil procedure study dealt with matters wholly within the expertise of trained lawyers and judges. Polygraphy simply does not fit into this category. Moreover, polygraphy has, for decades, been the subject of study, debate and controversy. It is too late in the day for just another study. Rather, the time is ripe for cautious judicial examination and evaluation. The experience gained may well lead to a total rejection of the concept. On the other hand, it could develop into a very

---

examiner.") However, he felt that such a ruling "should [not] be made in the first instance by the trial judge."

In any event, our holding today will not preclude the judge, if he so desires, from exercising his discretion on remand to deny the juvenile's motion. Therefore, if that was his initial intention, under our opinion he may do so again. On the other hand, our decision today leaves it open in the future for other judges to allow such motions in cases wherein they deem it desirable and proper. Finally, the majority opinion makes its intention clear not to overrule *Commonwealth* v. *Fatalo, supra,* and not to make polygraphic evidence generally admissible.

[12] Recently, a Superior Court judge with long prior experience (and an outstanding reputation) as a trial lawyer, at the conclusion of the evidence, offered the defendant the opportunity to take a polygraph test with the stipulation that the case would be dismissed if the defendant successfully passed the test. The test was taken with success and the case was dismissed to the complete satisfaction of all parties. This is cited not as an example to be followed routinely but only as an indication that, on occasion, wise and experienced judges welcome additional help in resolving very close factual issues.

useful tool in the administration of criminal justice. Actual testing in the courts is necessary before this determination can be made.[13]

The argument is made that only a few jurisdictions have seen fit to admit polygraphic evidence. I agree that it is much easier to wait until the majority of the States have done the arduous spadework in resolving novel, difficult, and complex questions of law, and then fall in line. However, our preference should be to work out our own destiny.

The dissenters urge that more detailed guidelines for the benefit of trial judges are needed. Here, we should not underestimate the resourcefulness and the ingenuity of experienced trial judges in dealing with novel situations where exact blueprints have not been provided. Nor should trial judges be unduly shackled in the exercise of their judgment. It is not the legitimate function of the courts of last resort to provide complete and detailed plans and specifications in anticipation of all possible problems and situations. The experienced trial judge can usually cope with them as they arise. Moreover, I do not believe that appellate judges are necessarily better informed or equipped to formulate in advance all inclusive guidelines for the trial judges. We have had ample experience on this score in recent years with the Supreme Court's efforts in dealing (or rather attempting to deal) with pornography, arrest, and search and seizure. In many instances, the guidelines have created more problems than were resolved. Our primary job is to decide whether the trial judge is right or wrong and then state sound reasons (hopefully) for our decisions. For many generations the trial judges have

---

[13] We recently had occasion in *Commonwealth* v. *McAlister, post,* 454 (1974), to comment on the value of out-of-court studies as an aid to judicial decision making. Although the studies referred to in that case are dissimilar (they were directed to the question whether "death-qualified" jurors are conviction-prone), the analogy is not lost, and the point made in that case bears repeating here. "The most serious difficulty, of course, is that all of these studies were outside of actual trials. No such simulated cases can reproduce the great responsibility which exists when 'in the solemnity of a court room a defendant is tried and his reputation and his liberty or his life are at stake.' " *Id.* at 461, quoting in part from *Commonwealth* v. *Blackburn,* 354 Mass. 200, 204 (1968).

provided the cutting edge for much of the law's progression. From their decisions, together with the overview of the appellate courts and the process of trial and error, the common law has evolved and progressed. In the main, this practice should be followed.

In the instant case, it is not necessary or wise to try to anticipate all procedural problems which may eventuate. Here a limited and cautious step is being taken, permissible only on motion of the defendant and subject to the exercise of the judge's discretion. Apart from the general guidelines provided in the opinion, it is wiser to let actual experience provide the learning for possible future guidelines.

Thus, if in the first instance, an experienced and courageous trial judge makes the decision to admit polygraph evidence, it would be best to let him exercise his judgment, subject to our review for possible error. Most trial judges are fully capable of meeting with and resolving the hypothetical problems raised in the dissenting opinions.

In any event, the last thing that should be considered is the formation of still another commission to undertake still another study to gather still more dust. Rather than take this dubious road, it would be far better to do nothing and wait for the courts in other jurisdictions to establish the merits and demerits of polygraphy through the time-tested adversary process.

## III.

In light of this disposition of the polygraph issue, which creates the possibility that the juvenile's motion may again be denied, it is necessary for us to deal with other grounds for reversal argued by the juvenile. The first concerns testimony by a Dr. Osgood, the medical examiner who performed the autopsy on the body of the victim. The juvenile contends that the trial court erred in allowing Dr. Osgood to state that in his opinion the blade of a knife, introduced in evidence as the alleged instrumentality of the

crime, could have inflicted the fatal wound. The blade was approximately three and one-half inches long; the handle was missing. The depth of the knife wound causing the victim's death was (a) between three to five centimeters from the outer skin to the heart, plus (b) approximately seven centimeters into the heart itself, or a total of between approximately four and five inches. From these facts, and from his observations that the victim had a "penetrating wound through his skin, chest wall, into his heart," Dr. Osgood concluded that the blade could have caused the fatal wound, and that the reason for the wound's depth was that the victim was probably "folded over" at the time the blade was inserted, causing the knife to penetrate more deeply. The juvenile objects to the characterization of the victim's possible position when the knife was allegedly inserted, contending that it is pure conjecture and is an unjustified assumption used to buttress the doctor's conclusion that the blade in question caused the victim's death. We disagree. A physician who has performed an autopsy may testify that the injuries which he observed could have been caused in a particular way or by a specified instrumentality. *Commonwealth* v. *Belenski*, 276 Mass. 35, 44 (1931). *Commonwealth* v. *LePage*, 352 Mass. 403, 418 (1967). *Commonwealth* v. *Boudreau*, 362 Mass. 378, 381 (1972). He is qualified to give such testimony because he is experienced in anatomy and in the study of the effects of blows and wounds inflicted on a body. Therefore, his opinion on a matter such as the position of a body during or after a knife stab, based on his medical knowledge and observations, is not a mere speculative assumption and was properly admitted.

The juvenile's next argument relates to testimony of another medical expert, Dr. Luongo. He was asked by the Commonwealth, "[P]resuming, . . . that if the jury finds as a fact that when this wound was inflicted, it had attached to it a handle similar in size and shape to the handle which is affixed to Commonwealth's Exhibit No. 11 — Doctor, would you now have an opinion as to — with that handle attached, could that blade, which is Commonwealth's

Exhibit No. 8, cause the injury which you and Dr. Osgood observed in the upper left chest of . . . [the victim]?'' The juvenile contends that this was an improper hypothetical question in that there was no independent evidence which supported the assumption that the blade was ever in fact attached to a handle like that attached to the blade introduced as exhibit 11. No handle was ever found. The alleged murder weapon, the juvenile argues, may never have been attached to a handle, or may have been attached to a different handle, or may have become separated from its handle before the time the stabbing allegedly took place. We believe that the existence of these possibilities did not make the hypothetical question improper. A medical expert may testify, in response to a hypothetical question, that the type of injury he has observed is consistent with the Commonwealth's theory of how the wound was inflicted, so long as that theory is based on other evidence already introduced. *Commonwealth* v. *Burke*, 339 Mass. 521, 530 (1959). The knife introduced as exhibit 11, complete with handle, and with a blade similar in size and description to the blade which the Commonwealth maintained was the instrumentality of death, was admitted without objection and was clearly intended to raise the inference that the alleged murder weapon at one time was attached to a handle. It is a matter of common knowledge that knives have handles. Counsel for the juvenile asked Dr. Luongo, ''You know knives generally have handles; do they not?'' Of course the jury could ultimately reject the inference that the blade had a handle at the time of the crime, and along with it Dr. Luongo's response to the hypothetical question, but we perceive no reason why the Commonwealth should have been prevented from pursuing its basic theory as to how the crime was committed. See *Commonwealth* v. *Moore*, 323 Mass. 70, 74-75 (1948).

On other grounds, the juvenile contends that he was entitled to a mistrial. The victim's father, in a nonresponsive answer, remarked on the witness stand that ''I saw him [the juvenile] abusing Jimmy [the victim]'' on an occasion before the murder took place. There can be no question that

the remark was improper. The trial judge properly struck that comment, and with clear and forceful language instructed the jury not to consider it.[14] The juvenile contends that a mistrial should have been declared. This is a matter for the judge's discretion, and in light of the fact that the judge took other appropriate measures to negate the possible prejudice stemming from the witness's remark, we cannot say that his decision not to grant a mistrial was reversible error.

The juvenile also contends that the judge erred in allowing a young friend of the juvenile to testify that the juvenile appeared "scared" on the evening when the victim was allegedly murdered. The juvenile contends that this answer was not admissible because the Commonwealth had not previously established that the witness was familiar with the juvenile's normal behavior. We disagree. Familiarity with a defendant, although it may go to the weight of the evidence, is not a prerequisite to admission of a witness's conclusory description based on observation of a defendant's "condition of mind" on a particular occasion. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 339 (1957). Even if it were, such familiarity was circumstantially demonstrated by the witness's additional testimony that he knew the juvenile for a period of years and saw him on a weekly basis.

The juvenile's final argument concerns the judge's refusal to charge the jury in accordance with requested instructions. Some background information is necessary to an understanding of the basic issue. The complaint against the juvenile specified that he committed homicide "with a Grant Maid Stainless U. S. A. table knife." At trial, the Commonwealth introduced the blade of such a knife. Before the judge charged the jury, the juvenile requested a specific instruction that the jury must find, beyond a reasonable doubt, that this particular blade had actually

[14] From the record it is clear that the judge reduced the reference to "abusing" to a parent's nervous account of a possible scuffle or pushing between the two boys. He thus attempted to remove from the case any suggestion of "extreme physical treatment" or "sexual misconduct."

caused the victim's death. The judge denied that request and the juvenile claims that the ruling was erroneous and prejudicial. The thrust of the argument is that in response to the language of the complaint the juvenile directed his defence to disproving that the particular knife was used, and that therefore it would be unfair to allow the jury to consider any other possible instrumentalities of death. Such an argument has been raised, and rejected, before. See *Commonwealth* v. *Jordan*, 207 Mass. 259, 267 (1911). The judge was correct in denying the juvenile's request. The means by which a murder is committed do not constitute an essential element of the crime of murder under G. L. c. 265, § 1. Language in an indictment or complaint specifying the means of death is therefore superfluous. A defendant is not entitled to an acquittal by reason of the Commonwealth's failure to prove unnecessary allegations in the description of a crime. G. L. c. 277, § 35. In any event, we find no prejudice. The complaint in this case clearly informed the juvenile that he was being charged with murder under c. 265, § 1. As such, he was on notice that if the Commonwealth were to prove all the essential elements of that crime, he would be convicted. Therefore, it cannot be said that as a result of the superfluous language of the complaint the defendant did not understand the crime charged, or was unable to prepare a proper defence. While as a matter of strategy the juvenile might have felt it best to focus his efforts on the question whether the particular knife was used, he was not forced or misled by the Commonwealth to take that approach.

Having considered and disposed of the juvenile's (non-polygraph) arguments we hold as follows: If the juvenile fails to file a motion for a new trial within thirty days or if the motion is filed and after a hearing thereon it is denied as a matter of discretion, the judgment shall be affirmed. In the alternative, if the defendant's motion for a new trial is allowed, the judgment shall be reversed, the verdict shall be set aside, and the case shall be remanded for a new trial.

*So ordered.*

QUIRICO, J. (dissenting, with whom Reardon and Kaplan, JJ., join). I dissent from the court's opinion on the issue of the admissibility in evidence of polygraph test results.

The trial judge made certain findings concerning the reliability and acceptance of polygraph examinations in connection with his denial of the defendant's motions to admit in evidence expert testimony describing the defendant's polygraph examination results.[1] Included was the statement: "Notwithstanding the foregoing findings and though counsel has cited some instances where the results of polygraphic tests have been admitted into evidence, I am not convinced that the courts in general have given widespread acceptance to this type of evidence, nor is there any indication that state legislatures have passed legislation permitting such tests or the results thereof as evidence. In any event, I do not feel that a favorable determination of the admissibility, if indeed it is warranted, should be made in the first instance by the trial judge."

On the basis of these findings, I cannot agree with the court that "the defendant's motions concerning polygraph tests were not denied by the trial judge as a matter of discretion but rather as a ruling of law." Furthermore, the findings make clear, in my opinion, that the judge was not compelled as a matter of law to grant the defendant's motions, and that he did not abuse his discretion in refusing to admit the proposed polygraph evidence. Therefore, even under the rule adopted today by the court I would uphold the judge's denial of such motions as a proper exercise of his discretion.[2]

1. I do not believe, however, that at this stage in the development of the polygraphic art, the admission of

[1] The judge's findings are quoted in pertinent part in the court's opinion at 424-425, *supra*.

[2] See *United States* v. *DeBetham*, 348 F. Supp. 1377 (S. D. Cal. 1972), affd. per curiam 470 F. 2d 1367, 1368 (9th Cir. 1972), cert. den. 412 U. S. 907 (1973). In that case the Federal Court of Appeals held, per curiam, that the trial judge had not abused his discretion in refusing to admit polygraphic evidence offered by the defendant, although the trial judge's opinion (348 F. Supp. at 1379-1380, 1391) was based in large part on his belief that a decision permitting the admission of such evidence should be made in the first instance by the appellate court.

polygraphic evidence should be a question left to the discretion of the trial judge. My belief is strengthened by an examination of the record before the trial judge in this case when he made his findings and decision. The record consisted of: (1) the testimony of three witnesses; (2) an offer of proof of the testimony of a fourth witness which was read into the record by the defendant's attorney; and (3) an article entitled, "The Polygraph in a Psychiatric Setting," by Stanley Abrams, published in 130 Am. J. Psychiatry 94 (1973).

Of the four witnesses, two were professional polygraph examiners in private practice, one was the polygraph examiner for the Massachusetts State Police, and one was a psychiatrist. None of the practising examiners appeared to have had any training in psychology or physiology; their expertise and knowledge of the field were based on practical experience and participation in short courses given at professional polygraph schools. The psychiatrist's knowledge of recent developments in the field appeared to be general and not based on personal experience or study. The article introduced has no bearing on the use of polygraphic evidence in criminal trials or on the reliability of polygraph tests in general; rather, it is a short report by a psychologist of his use of the polygraph as a therapeutic tool.

The defendant had the burden of overcoming the "substantial doubts" about the reliability and scientific recognition of polygraph tests referred to by this court in *Commonwealth* v. *Fatalo*, 346 Mass. 266, 268-270 (1963), as he apparently concedes in his brief. In view of (1) the *Fatalo* case, (2) the fact that even eleven years later so few courts have admitted unstipulated polygraph evidence,[3] and (3)

---

[3] Of the three cases introduced as exhibits by the defendant, *United States* v. *Zeiger*, 350 F. Supp. 685 (D. D. C. 1972), was reversed per curiam (475 F. 2d 1280 [D. C. Cir. 1972]). In *United States* v. *DeBetham, supra*, the Court of Appeals for the Ninth Circuit affirmed the trial court's denial of the defendant's offer to admit polygraph evidence. Unstipulated polygraph evidence was introduced in *United States* v. *Dioguardi*, No. 72 Cr. 1102 (E. D. N. Y. November 30, 1972), *United States* v. *Hart*, 344 F. Supp. 522 (E. D. N. Y. 1971), and *State* v. *Watson*, 115 N. J. Super. 213 (1971) (post-trial motion on sentencing). There do not appear to be any

Commonwealth *v.* A Juvenile.

the fact that so many courts continue to refuse to admit such evidence because they still consider it unreliable (see, e.g., *United States* v. *Frogge*, 476 F. 2d 969, 970 [5th Cir. 1973]; *United States* v. *Urquidez*, 356 F. Supp. 1363 [C. D. Cal. 1973]; *United States* v. *Wilson*, 361 F. Supp. 510 [D. Md. 1973]), it is my opinion that the total sum of information placed before the trial judge falls far short of what this court should require to enable it to reach a proper decision on an issue of such far-reaching consequences as the admission of polygraphic evidence. Compare the record in this case to the description of the evidence presented in *United States* v. *DeBetham*, 348 F. Supp. 1377, 1380-1382, 1384-1389 (S. D. Cal. 1972), affd. per curiam 470 F. 2d 1367, 1368 (9th Cir. 1972), cert. den. 412 U. S. 907 (1973); *United States* v. *Ridling*, 350 F. Supp. 90, 92 (E. D. Mich. 1972); and *United States* v. *Zeiger*, 350 F. Supp. 685, 686-690 (D. D. C. 1972), revd. per curiam 475 F. 2d 1280 (D. C. Cir. 1972), all relied on by the defendant. Furthermore, it is worth noting that in *United States* v. *Frogge, supra*, the court rejected the *Ridling* opinion, stating, "Though a trend may be emerging towards loosening the restrictions on polygraph evidence . . . the rule is well established in federal criminal cases that the results of lie detector tests are inadmissible. . . . Nothing in *United States* v. *Ridling*, 350 F. Supp. 90 (. . . 1972), heavily relied upon by the appellants, persuades us to abandon the traditional view." 476 F. 2d at 970.

2. I recognize, however, that even if this court were to affirm the denial of the defendant's motions it should not end thereby any further consideration of polygraphic evidence. From reading cases and commentaries on the subject I acknowledge there are many claims that the polygraph is making advances in technical or scientific and

other reported criminal cases where unstipulated polygraph evidence has been admitted, although a few courts have indicated that in future cases the question of admission may be within the discretion of the trial judge. See *United States* v. *Wainwright,* 413 F. 2d 796, 803 (10th Cir. 1969), cert. den. 396 U. S. 1009; *United States* v. *Lanza,* 356 F. Supp. 27, 30 (M. D. Fla. 1973); *State* v. *Alderete,* 86 N. M. 176 (1974).

legal terms and is being treated with increasing acceptance in a variety of fields. Nevertheless, there remains serious doubt whether the reliability or scientific recognition of polygraph tests has become sufficiently established since *Commonwealth* v. *Fatalo, supra,* was decided. Accordingly, I do not believe the court is warranted in holding on a record as limited as the one before us that evidence of polygraph tests may now be admitted in criminal trials at the discretion of the trial judge. I believe a far more prudent and sensible approach would be for the court under its rule making powers to appoint a special committee or commission with a mandate to conduct a thorough study of the validity and reliability of the polygraph test itself and of the manifold problems connected with the admission of such test results as evidence in criminal trials and other judicial proceedings.

3. One of the principal reasons I suggest such a study is that my limited research on the subject indicates that the validity and reliability of polygraph examinations are still relatively unknown and perhaps unmeasurable quantities. The basic technique and theory on which the polygraph operates have not changed significantly since the 1920's, when *Frye* v. *United States*, 293 Fed. 1013 (D. C. Cir. 1923), was decided, the first case to consider (and reject) a precursor of the polygraph for evidentiary purposes. And as the court points out in the present case, the theoretical basis of the polygraph test continues to be questioned today for the same reasons it was at the time of our *Fatalo* decision.[4]

More significantly, there is still very little information of widespread acceptance concerning the accuracy and reliability of the polygraph test as a means of detecting deception, and the difficulties which exist in trying to reach a sound assessment of these factors appear to be substan-

---

[4] Compare Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L. J. 694, 700-703, 727 (1961), with Orne, Implications of Laboratory Research for the Detection of Deception, 2 Polygraph 169 (1972), and Orne and others, On the Detection of Deception, in Greenfield and Sternbach, editors, Handbook of Psychophysiology 743, 744, 749 (1972).

tial. See Orne and others, *supra*, at 749-751; Orne, *supra*, at 170, 188, 196. It is pointed out that many of the statistics provided by field practitioners about the reliability of the tests are questionable because they are based on the assumption that the examiner's decision that a subject is lying or telling the truth is correct unless it is proved wrong by further investigation or other means; similarly, statistics on the validity of the polygraph test based on subsequent confession or convictions are unreliable because there is no guaranty that such confessions or convictions always represent the truth.[5] It is also suggested that statistics derived from laboratory experiments fail to provide any meaningful indication of the accuracy or reliability of the polygraph test. [6]

A meaningful assessment of the test's validity is made more difficult by the critical role the examiner plays in the results of any polygraph examination. The private biases and impressions the examiner forms about the subject's guilt or innocence before administering the test will influence his formulation of questions and structuring of the test as a whole; the test results themselves are thereby affected.[7]

Turning to examiner competence, it is without question that this factor is of critical importance as all the defendant's expert witnesses and the court point out. The emphasis put on the skills, experience, and integrity of the examiner is not surprising since the results of a polygraph examination cannot be derived directly from the polygraph machine itself but depend on the examiner's interpretation and analysis of charts obtained from the machine. It is

---

[5] Orne, *supra*, at 174, 179-180. Orne and others, *supra*, at 750. See *United States* v. *DeBetham*, *supra*, at 1385; Reid and Inbau, Truth and Deception: The Polygraph ("Lie-Detector") Technique at 234 (1966); Radek, The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo, 3 Loyola U. of Chicago L. J. 289, 297 (1972); note, 20 Drake L. Rev. 330, 334 (1971).

[6] Orne, *supra*, at 184-185.

[7] Orne, *supra*, at 175-177. Orne and others, *supra*, at 750-751.

stated that about sixty-five per cent of the cases require a "highly skilled and well trained examiner" for their interpretation.[8] However, available statistics about the general level of qualified examiners are not encouraging. In 1964, Inbau and Reid stated that only twenty per cent of practising examiners were competent and qualified.[9] No later statistics showing improvement in this rating were cited by the defendant and I found none. A number of States have passed legislation regulating polygraph examiners,[10] but Massachusetts has not. And, as the court also states, no uniform levels of competence are enforced by the polygraph industry itself.

These questions raised about the ability of the polygraph test to determine whether or not a person is telling the truth and about the general level of examiner competence must be considered in relation to the test's potential effect on the trial process. It seems very probable to me that if the evidence of a criminal defendant's polygraph test results were admitted at his trial, it could turn out to be the conclusive determinant of his guilt or innocence, despite the doubts about the test's accuracy. The evidence ultimately offered is likely to be no more than the opinion of the polygraph examiner that the defendant was lying or telling the truth when, in response to a test question, he answered that he did not commit the crime in question; nevertheless, an almost impenetrable aura of scientific infallibility may well surround the polygraph machine itself in the minds of

---

[8] Horvath and Reid, The Reliability of Polygraph Examiner Diagnosis of Truth and Deception, 62 J. Crim. L., Criminology and Police Science, 276, 278 (1971).

[9] Inbau and Reid, The Lie-Detector Technique: A Reliable and Valuable Investigative Aid, 50 A. B. A. J. 470, 473 (1964).

[10] See, e.g., Ark. Anno. Sts. §§ 71-2201 to 71-2225 (1957) (see Supp. 1973); Fla. Anno. Sts §§ 493.40 to 493.56 (1965) (see Supp. 1974-1975); Ga. Code Anno. §§ 84-5005 to 84-5008 (1970) and (Supp. 1973); Ill. Rev. Sts. c. 38, §§ 202-1 to 202-30 (1973); Ky. Rev. Sts. Anno. §§ 329.010 to 329.990 (1972); Miss. Code Anno. §§ 73-29-1 to 73-29-47 (1972) and (Supp. 1973); Nev. Rev. Sts. §§ 648.005 to 648.210 (1973); N. M. Anno. Sts. §§ 67-31A-1 to 67-31A-11 (1953) (see Supp. 1973); N. D. Century Code Anno. §§ 43-31-01 to 43-31-17 (1960) (see Supp. 1973); Tex. Rev. Civ. Sts. Anno. art. 4413 (29cc) (1966) (see Supp. 1974); Va. Code Anno. §§ 54-729.01 to 54-729.018 (1972) and (Supp. 1973). See note, 23 Catholic U. L. Rev. 101, 115, fn. 74 (1973), for a brief description of the legislation.

the jurors. As a result, there is a grave risk that the jurors will regard such opinion testimony as resolving the ultimate question of the defendant's guilt or innocence, not considering polygraphic evidence as they do other expert testimony and, contrary to the court's instructions, not in fact weighing it with all the other evidence presented. The jury's historic function as the finder of fact and their related responsibility to determine the credibility of witnesses may be replaced by the polygraph machine.

The significant or undue influence that polygraphic evidence may have on a jury has been a problem discussed extensively by both the courts and commentators.[11] It is my opinion that the likelihood of this influence is such that we cannot permit polygraphic evidence to be admitted without examining more thoroughly the available information about the accuracy and reliability of polygraph tests than is possible on the record before us;[12] it also seems that further consideration must be given to the protective measures which could be employed to guard against it. Although the contrary is suggested by the court in its opinion, I do not believe that cross-examination of the polygraph examiner offers a great degree of protection. Given the subjective nature of the examiner's interpretation and the lack of minimum or uniform standards for qualification, the opposing party will have a difficult time effectively challenging the examiner or his testimony. To the extent that cross-

---

[11] See, e.g., *United States* v. *Stromberg,* 179 F. Supp. 278, 280 (S. D. N. Y. 1959); *United States* v. *Zeiger, supra,* at 691; *People* v. *Leone,* 25 N. Y. 2d 511, 518 (1969); Radek, The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo, 3 Loyola U. of Chicago L. J. 289, 295-296, 300-302 (1972); note, 53 B. U. L. Rev. 375, 383-388, 390 (1973); note, 4 Suffolk U. L. Rev. 111, 119, 123 (1969). Cf. *United States* v. *Ridling, supra,* at 96-97, 98; note, 48 N. Y. U. L. Rev. 339, 347-348 (1973).

[12] See Radek, *supra,* at 301-302.

Commentators assert that a polygraph examination is much more reliable than many other types of scientific evidence, particularly psychiatric evaluations. See Reid and Inbau, Truth and Deception, at 256, 257; Orne, *supra,* at 188-189; note, 73 Col. L. Rev. 1120, 1138-1139 (1973). However, it seems likely that the jury would attach greater significance to the opinion of a polygraph expert than to a psychiatric opinion solely because of the role played by the polygraph machine. It is also important to note the greater level of academic and clinical training uniformly required of psychiatrists than required of polygraph examiners.

examination is effective, there is a danger that the trial will become a battle of experts. In *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963), this court emphasized the confusion resulting from such a battle in excluding polygraphic evidence. It is significant that in *United States* v. *Urquidez*, 356 F. Supp. 1363, 1365, 1366-1367 (C. D. Cal. 1973), decided ten years later, a Federal District Court excluded polygraphic evidence for the same reason, quoting from the *Fatalo* opinion.

The court has expressly avoided establishing minimum standards for the qualification of polygraph experts although, as it notes, many authorities take the contrary position that polygraphic evidence should not be admitted unless such minimum qualifying standards are applied.[13] Many also suggest that in any jury trial where such evidence is used, the court should give limiting instructions about the weight the evidence should be given by the jury.[14] I believe both these suggestions and other protective steps could and should be studied, although the opportunity to do so does not present itself in the context of this case.

4. There are many procedural and substantive legal questions which arise in connection with the admission of polygraph evidence and which I believe need further study by this court before such admission is permitted. I mention only a few to illustrate my point.

The opinion of the court provides that the defendant alone can request that a polygraph examination be administered to him; the Commonwealth has no corresponding right. I would agree that by reason of the privilege against self-incrimination the Commonwealth could not compel a defendant to take a polygraph test. However, I am not sure

---

[13] See fn. 6 of the court's opinion for a summary of the qualifications Reid and Inbau would require. See also note, 20 Drake L. Rev. 330, 347-348 (1971), where it is suggested that polygraphic evidence should not be admitted until legislation regulating examiners is passed.

[14] See, e.g., *United States* v. *Ridling, supra,* at 96-97; *United States* v. *Zeiger, supra,* at 691; *State* v. *Valdez,* 91 Ariz. 274, 283-284 (1962); *State* v. *Stanislawski,* 62 Wis. 2d 730 (1974); Reid and Inbau, Truth and Deception, at 257; note, 48 N. Y. U. L. Rev. 339, 347-348 (1973).

that the Commonwealth should or can be precluded from having its own expert retest a defendant whose motion to submit to a polygraph examination has been allowed and from introducing the results of the retest at the trial. The proposed "option one" appears so to preclude the Commonwealth. Cf. *United States* v. *Ridling, supra,* at 99.

Although the court discusses the defendant's constitutional right against self-incrimination and its waiver, I believe many questions remain unresolved. The first concerns the type of notice and warning that should be given the defendant with respect to his right to remain silent. This question seems particularly important in the case before us, involving, as it does, a juvenile. See note, 48 N. Y. U. L. Rev. 339, 353-355 (1973). A second question is whether, once the admissibility of polygraph evidence is established, a defendant's failure to offer such evidence in a jury trial will be interpreted as evidence of guilt; if such a result seems possible, perhaps it is necessary to consider what steps might be taken to prevent the jury from drawing such an inference. See annotation, 95 A. L. R. 2d 819 (1964); note, 53 B. U. L. Rev. 375, 392-396 (1973).

The "four options" procedure outlined in the court's opinion fails to establish, in my judgment, sufficiently detailed guidelines to govern the admission of polygraphic evidence. For example, no guidance is given the trial judge to help him evaluate and compare the options permitted the defendant, a task which seems necessary if the judge is to rule properly on a motion brought under any one of them. Furthermore, there is some indication that the validity of the polygraph test results themselves may be influenced by the defendant's choice of options: one authority suggests that a defendant's test results might well be affected if the examiner is hired and paid by the defendant or his attorney. See Orne, *supra,* at 193-195.

The court states that it is taking "a cautious first step toward the acceptance of polygraph testing." Many other courts, however, have used a more limited approach to the admissibility of polygraphic evidence, permitting its ad-

mission only when the parties have entered a stipulation for that purpose. See cases collected in annotation, 53 A. L. R. 3d 1005 (1973). In addition to the requirement for such a stipulation, the courts have often set forth detailed conditions to govern the admission. See *State* v. *Stanislawski*, 62 Wis. 2d 730, 741-743 (1974), decided earlier this year.[15] Cf. *Romero* v. *State*, 493 S. W. 2d 206, 213 (Tex. Crim. App. 1973).

5. The failure to provide the necessary guidelines seems to be due in large part to the limited nature of the record before the court in this case, for it does not appear that the record contains enough evidence or information on which to base a more extensive treatment of the admission procedure. In fairness to the defendant, however, it must be recognized that it is probably beyond the financial and other capacity of the average individual litigant to establish a record of the type the court should have available to it before it can make an intelligent decision on this important issue — a decision which inevitably will have a precedent-setting effect on the future trial of cases. See *United States* v. *Urquidez*, 356 F. Supp. 1363, 1366-1367 (C. D. Cal. 1973).

The establishment of an appropriate basis on which to make such a decision could be accomplished in either of two ways: (1) by a legislative study conducted as a basis for possible legislation; or (2) by a judicial study conducted under this court's rule making powers. It is noteworthy that the General Court has dealt three times in recent years with the uses of the polygraph, each time in connection with statutes relating to employment: St. 1959, c. 255, which inserted in G. L. c. 149, § 19B, prohibiting an employer from requiring or subjecting "any employee to any lie detector tests as a condition of employment or continued employment"; St. 1963, c. 797, which rewrote § 19B

---

[15] In that case, the Supreme Court of Wisconsin reversed its long-standing rule of exclusion (*State* v. *Bohner*, 210 Wis. 651 [1933]) and held that polygraphic evidence may be admitted if all the parties enter a written stipulation to that effect. Its admission, however, would remain subject to the discretion of the trial judge and would also be subject to stringent and detailed rules and instructions which go far beyond those being required by the court in this case.

without changing its meaning, except to add a proviso that the section "shall not apply to lie detector tests administered by law enforcement agencies in the performance of their official duties" (it contained no new provisions pertaining to any other uses of such tests); and St. 1973, c. 620, which amended the section again, making its original employment provisions applicable to any person applying for employment as a police officer.[16]

This history of the Legislature's actions in the field of polygraph tests shows that it has not heretofore directed its attention to the use of such test results as evidence in judicial proceedings. Nor is there any indication that it is likely to do so in the imminent future. But studies similar in nature to the one I feel necessary here have been conducted under the auspices of the court,[17] and I believe a study of the issue of polygraphic evidence could be successfully undertaken. Located in Boston, in the midst of several great universities, this court has available to it the abilities and experience of leading scientists, lawyers and experts in many other fields of relevance to the polygraph. These persons could provide needed assistance in conducting such a study and could make significant contributions to it. If indicated by the study's findings, we could then consider drafting rules to govern the subject of polygraphic evidence. Such an approach seems to offer the best opportunity for developing a sound, effective procedure within a reasonable period of time to regulate the admission and use of this type of evidence in future trials.

---

[16] It appears that at least twelve States have passed legislation prohibiting the use of polygraph examinations in the employment context. See The Polygraph in Employment: The Consequences of its Search for Truth, a report of the Committee on Labor and Social Security Legislation, appearing in 28 Record of the Association of the Bar of the City of New York 464, 465, fn. 6 (1973). (The majority report of this committee recommends that the use of polygraph examinations in the employment context be barred by law in New York. Id. at 476.)

[17] One example is the work of the Advisory Committee on Civil Procedure originally appointed by the Judicial Conference to study and to draft a new set of proposed rules of civil procedure; this court subsequently adopted the committee's proposals, with modifications, as the Massachusetts Rules of Civil and Appellate Procedure, effective July 1, 1974.

Commonwealth *v.* A Juvenile.

KAPLAN, J. (dissenting, with whom Reardon and Quirico, JJ., join). Agreeing in substance with all that Justice Quirico has written, I add a few words. Such reading as I have been able to do about the diagnostic method called "polygraph" — for it is not just a machine but a method — leaves me less confident of its reliability than the majority opinion appears to be. My impression is that, in the family of scientific aids to the forensic search for truth, the polygraph remains a rather remote relation of shabby gentility.

But if the polygraph were more nearly equal to the claims made for it, I would still think the majority opinion inadequate to support its conclusion, because it offers only a fragmentary guide to the procedures to be followed and decisions to be made in the actual utilization of the polygraph for the ultimate purposes of criminal trial. The same deficiency exists in the literature about the polygraph; it is a weakness one might expect, in view of the nearly unanimous rejection by the courts to the present day of the results of unstipulated polygraph testing. The majority opinion attracts the sympathy of the reader by saying that only a small step is being taken, and that comprehensive rules should be written after experience has accumulated. The step does not strike me as being small, but in any event the suggested progression from judicial experimentation to the formulation of rules, which is sound enough for some legal innovations, seems badly calculated for this one. Trial judges and the bar should not be left to grope on so important a matter; they deserve better help from the start, and this, as Justice Quirico says, should have come from the work of a commission, if any move was to be made to domesticate the polygraph.

The step taken by the majority involves an element that is quite novel, namely, the proposition that once the defendant agrees to take a court-sanctioned test, the results become admissible on either side — to which is added the novel (and aleatory) twist of the four-way choice. Were I acting as counsel, I am not sure on what basis I could now advise a client whether he should submit himself to the

polygraph. Questions arising upon the trial proper are equally obscure and difficult: add as a further illustration to those mentioned by Justice Quirico the question whether a defendant will be entitled to try to rebut the results of a court-sanctioned test, if damaging to him, by taking another test without application to the court and then introducing its results. The uncertainties appear all the more serious when we reflect that the failure of a defendant to volunteer for polygraph testing is likely to make a deep impression on the triers, as are the results of the testing, which may seem to speak with the voice of impartial science.

If we are to go ahead without a commission, then at least there should be an effort to collate and examine in some orderly way the experience of the trial judges and the bar as they seek to follow the trail indistinctly marked by the majority. But that is not provided for and is not easily promoted. Our trial judges are not in the habit of writing extended opinions, nor are their opinions published. Exchange of experience and ideas at conference is not frequent and is rarely searching. Appellate review in the ordinary course can afford only sporadic help. What the situation suggests is that special means should be employed to tame and rationalize the force that the majority has set loose. A commission inquiry is still possible, although it would operate after the event. And there may be scholars willing to keep watch as our courts and lawyers contend with the polygraph.

An understandable impatience with our criminal justice system and its traditional, lumbering methods of fact finding has led, I believe, to the impetuous adoption of a dubious expedient. I am not reconciled to the majority decision by its suggestion that the actual admission of the results of polygraph testing at trial will be infrequent. It may indeed be that the confused procedural and tactical situation will discourage applications for the polygraph, and the ultimate good judgment of trial judges will still further limit its use as evidence. But whatever these eventualities, we have an obligation to the individual case.