UNITED STATES of America

v.

Errol ZEIGER.

Crim. No. 1831–70.

United States District Court,
District of Columbia.

Oct. 10, 1972.

F. Lee Bailey, Frederic J. Barnett, Boston, Mass., William G. Ohlhausen, Washington, D. C., for defendant.

Harold H. Titus, Jr., U. S. Atty., John F. Evans, Asst. U. S. Atty., U. S. District Court, Washington, D. C., for plaintiff.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The defendant, Errol Zeiger, is charged in a multi-count indictment with having committed, on or about October 9, 1969, an assault with intent to kill while armed, 22 D.C.Code § 3202 (Supp. V, 1972), and other related offenses.[1] His counsel sought and was granted a motion for a pre-trial evidentiary hearing on the admissibility of the results of a polygraph examination administered to the defendant on October 21, 1969, by Lt. Hamilton W. Shoop, then a member of the Metropolitan Police Department. Over several days of hearings the defense submitted expert testimony intended to establish a foundation for the admission at trial of testimony of Lt. Shoop regarding the polygraph examination of the defendant.

The Court, after consideration of the entire record including the transcript of the proceedings, as well as the memoranda of counsel concludes that an adequate and sufficient foundation has been established in this case for permitting the presentation of expert testimony on the results of the defendant's polygraph examination at the trial of this proceeding.

■ The rule governing admissibility of the results of polygraph tests in this Circuit was first established in Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923) and has never been disturbed.[2] In that trial proceeding the defendant offered an expert witness to testify on the result of a deception test made upon the defendant.[3] In affirming the trial judge's refusal of the proffer, the court said:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced

1. The defendant also stands indicted of the crimes of assault with intent to kill, assault with a dangerous weapon and carrying a dangerous weapon. 22 D.C. Code §§ 501 (Supp. V, 1972), 502 (1967) and 3204 (1967). At an earlier jury trial in January 1972 the defendant had been found guilty of an assault with intent to kill and carrying a dangerous weapon. Following that a motion for a new trial was granted on the grounds the verdict was against the weight of the evidence.

2. In Tyler v. United States, 90 U.S.App. D.C. 2, 193 F.2d 24 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952), the court affirmed the admission by the trial court of the testimony of a polygraph examiner concerning the defendant's examination where the purpose of the testimony was to show the voluntariness of the confession subsequent to the examination, rather than to reflect the truthfulness of the statements. The court pointed out that it did not mean to impair the ruling in Frye by admitting the testimony under the special circumstances of that case. 193 F.2d at 31.

3. The instrument employed for the detection of deception in Frye was a systolic blood pressure device, essentially consisting of a sphygmomanometer, an instrument used by physicians in determining a patient's blood pressure, by means of which periodic discontinuous blood pressure readings were obtained. J. Reid & F. Inbau, Truth and Deception, 2 (1966). This was a crude instrument compared to the modern polygraph, which by definition records more than a single parameter such as blood pressure. Transcript at 136. The machine used in the defendant's examination, a Stoelting polygraph, records changes in five different parameters including blood pressure, pulse rate, respiration rate, diaphragmatic area of the body, and the resistance of the skin to electrical current. Transcript at 565, 566.

from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorites as would justify the courts in admitting expert testimony deduced from the discovery, development and experiments thus far made." 293 F. at 1014

The case thus established a test for the admission of polygraph testimony and made the initial factual finding that the state of the art of polygraphy failed to satisfy the test at that time. Federal courts in other circuits subsequent to *Frye* have denied requests to receive this type of evidence where opposed by one of the parties.[4] This Court, when presented with a proffer of a polygraph examination is necessarily bound by the dictates of *Frye* which, having established a standard, require the trial court to determine whether the requirements for admission have been met.[5]

■■ Applying the standard promulgated in *Frye*, the Court is now called upon to determine whether the polygraph currently enjoys general acceptance among the authorities in the field. A preliminary task is to define the phrase "general acceptance." The cases following the *Frye* rationale have been carefully considered and they offer little guidance.[6] It is observed, however, that acceptance of the polygraph can be meaningfully determined only with respect to a particular purpose for which the device is used and the degree of reliability required for that purpose. There is nearly unanimous recognition that the polygraph can achieve accuracy of better than 50 per cent, but few would accept the proposition that the technique is almost infallible.[7] For the purpose here at issue, *Frye* requires such acceptance and recognition "as would justify the courts in admitting expert testimony" deduced from a polygraph examination.[8] The general criterion required for the admission of evidence is its relevance or

4. *See, e. g.,* United States v. Salazar-Gaeta, 447 F.2d 468 (9th Cir. 1971) ; United States v. Sadrzadeh, 440 F.2d 389 (9th Cir. 1971) ; United States v. Rodgers, 419 F.2d 1315 (10th Cir. 1969) ; United States v. Wainwright, 413 F.2d 796 (10th Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1969) ; United States v. Tremont, 351 F.2d 144 (6th Cir. 1965) ; McCroskey v. United States, 339 F.2d 895 (8th Cir. 1965) ; Marks v. United States, 260 F.2d 377 (10th Cir. 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959) ; Tyler v. United States, 90 U.S.App.D.C. 2, 193 F.2d 24 (1951) ; United States ex rel. Sadowy v. Fay, 189 F.Supp. 150 (S.D.N.Y.1960), aff'd, 284 F.2d 426 (2d Cir. 1960) ; United States v. Stromberg, 179 F.Supp. 278 (S.D.N.Y. 1959), aff'd as modified, 268 F.2d 256 (2d Cir. 1959), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

5. The cases cited in note 4, *supra,* may be distinguished from the case at bar. None of them involved an attempt to establish a foundation for the admission of polygraph testimony by means of the presentation of expert witnesses to show the scientific acceptance and reliability of the polygraph. *See, e. g.,* United States v. Wainwright, *supra,* 413 F.2d at 803.

6. There is notably an absence of any discussion of the "general acceptance" standard in federal decisions. *See* cases cited note 4, *supra.* Some state courts have equated "general acceptance" with "reasonable certainty" of the polygraph's accuracy, apparently because of their belief that polygraph tests would necessarily have tremendous weight in the minds of a jury and that the accuracy of the tests should therefore conform to the weight which the jury would give them. *See, e. g.,* People v. Davis, 343 Mich. 348, 72 N.W.2d 269 (1955) ; People v. Leone, 25 N.Y.2d 511, 307 N.Y.S.2d 430, 255 N.E.2d 696 (1969).

7. *See, e. g.,* the testimony of Dr. Martin T. Orne, the Government's expert psychophysiologist, in which he states that the accuracy of the polygraph is vastly better than chance, but that 99 per cent accuracy is unlikely. Transcript at 509.

8. 293 F. at 1014.

tendency to prove a material fact.[9] "[I]f evidence is logically probative, it should be received unless there is some distinct ground for refusing to hear it."[10] And so *Frye* has been interpreted to demand general acceptance among the experts that current polygraph technique possesses a degree of reliability which satisfies the courts of its probative value. The term "general" is understood to have been used in its ordinary and non-technical sense, as meaning "common to many, or the greatest number; widespread; prevalent; extensive though not universal."[11]

In determining whether the modern polygraph has gained general acceptance, it is appropriate to note the status of the detection of deception at the time of *Frye*, when polygraphy was adjudged to be in the "twilight zone" between the experimental and demonstrable stages. By 1923 knowledge of the phenomenon of detection of deception, although it dated back nearly 30 years, was apparently confined to a small group of persons who had experimented with detection devices.[12] Some reported a high percentage of accuracy in their results but few credible scientific studies had been published.[13] There was scarcely any discussion of the subject in legal periodicals and the courts had not been afforded opportunity to hear and weigh testimony from the contemporary experts concerning the reliability and the acceptance of the devices.[14]

Today, polygraphy has emerged from that twilight zone into an established field of science and technology. The polygraph has been and continues to be the subject of scientific study and investigation,[15] and although the precise limitations of the device and the intricacies which affect its performance may not be understood to the complete satisfaction of the scientific community, enough is known about it to confirm that it is a useful tool for detecting deception. Its extensive use by law enforcement agencies, governmental security organizations, and private industry throughout the country is testimony to the undeniable efficacy of the technique.[16] The practice has acquired the usually accepted indicia of a profession, such as a national professional organization, training schools, qualification standards, yearly seminars, and specialized publications. A growing number of courts have admitted in recent years that the polygraph does contribute to the administration of justice.[17] Trial courts which have had the benefit of the presentation of foundational testimony have concluded that polygraph technique is reliable, although they have ruled against its unstipulated admission for other reasons.[18] The Court has been informed that one Federal District Judge

9. *See* 1 J. Wigmore, Evidence § 10 (3d ed. 1940) ; Committee on Rules of Practice and Procedure, Judicial Conference of the United States, Proposed Rules of Evidence for U.S. District Courts and Magistrates, Rules 401, 402 (Rev.Draft Oct. 1971).

10. C. McCormick, Evidence § 184 (2d ed. 1972).

11. *See, e. g.,* Platt v. Craig, 66 Ohio St. 75, 63 N.E. 594 (1902).

12. Reid & Inbau, *supra* note 3, at 1–3.

13. Id.

14. *See* Brief for Appellee at 4–9, Frye v. United States, *supra.*

15. See Defendant's Exhibit 7, A Bibliography of Scientific Studies Pertaining to the Validity of Current Lie Detection Techniques.

16. *See* Reid & Inbau, *supra* note 3, at 226–32 ; McCormick, *supra* note 10, at 506–7 & nn. 10 & 11.

17. *See, e. g.,* State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962) *(en banc).* *See also* Reid & Inbau, *supra* note 3, at 233–34.

18. *See, e. g.,* the well reasoned memorandum opinion in United States v. DeBetham, 348 F.Supp. 1377 (S.D.Cal., 1972). *See also* Transcript § 5, at 1–3, People v. Lazaros, Crim.No. 6237 (Mich. Cir.Ct., County of Oakland, June 25, 1970). *But see,* People v. Leone, *supra* note 6.

has recently ruled that he will admit polygraph evidence under certain conditions.[19]

A comment is in order concerning the consideration which the Court has given to the opinions of experts who are neither physiologists nor psychologists. Part of the holding in *Frye* was phrased in terms of "recognition among physiological and psychological authorities" but the general rule established by the case called for "general acceptance in the particular field in which [the polygraph] belongs." Although polygraphy at one time may have been dependent on physiological and psychological authorities for certification of its reliability, it is no longer appropriate to confine consideration solely to those disciplines. Certainly any individuals who have had experience in the specialized area of the polygraph, whether they are medical doctors, scientists, or polygraph examiners, can contribute to the Court's inquiry into the matters of acceptance and reliability. For this reason, testimony by any qualified expert in the field of polygraphy concerning studies and experiences with the machine is relevant to questions which are before the Court.

The Court received testimony from several experts during the course of the hearings verifying the reliability of the polygraph. John E. Reid, one of the leading authorities in the field, testified that in studies he had recently conducted in collaboration with Frank S. Horvath, an accuracy of better than 91 per cent among experienced examiners was found.[19] He also asserted that in the 1966 edition of his text, Truth and Deception, coauthored with Fred E. Inbau, a professor of law at Northwestern University, the authors reversed the position on the admissibility of polygraph evidence which they adopted in an ear-lier work because of significant advances in the field.[20] In their recent text the authors explain:

> The Polygraph technique which we have described, when properly used by competent, experienced examiners, possesses a high degree of accuracy. This we can conscientiously report from our experience in the examinations, personally, or in the supervision of the Polygraph examinations, of over 35,000 subjects.[21]

Lynn P. Marcy, a polygraph examiner with 15 years of experience, testified that of the 30 per cent of the 8,000 examinations which he conducted and which were subjected to verification through supporting admissions, confessions, or additional evidence, only six known errors were noted.[22] The accuracy of his diagnoses was estimated in excess of 90 per cent.[23]

David C. Raskin, a psychologist who performed research in the areas of psychophysiology, stated that his laboratory studies in simulated field situations showed an agreement among examiners of 95.5 per cent and a rate of correct decisions of almost 82 per cent, which was considered "quite good" for a laboratory situation.[24] He concluded:

> I feel strongly that [polograph technique] is a highly accurate, extremely useful technique for detecting deception.
>
> This is based on my experience both in our laboratory study and experiences we have had based upon live cases . . . .[25]

Martin T. Orne, a respected polygraph authority and a professor of psychiatry and psychology at the University of Pennsylvania, testified for the Government that the true accuracy of the polygraph is not known but that there is agreement in the scientific community

---

19. United States v. Ridling, 350 F.Supp. 90 (E.D.Mich., 1972) (memorandum opinion).

19. Transcript at 137–40.

20. Transcript at 134–35.

21. Reid & Inbau, *supra* note 3, at 257.

22. Transcript at 39–41.

23. *Id.*

24. Transcript at 362–64.

25. Transcript at 374.

that the polygraph works "far better than chance" and that he would place its accuracy at 85 per cent or perhaps higher.[26]

The testimony of the experts and the studies appearing in the exhibits lead the Court to believe that the polygraph is an effective instrument for detecting deception. The failure of the Government to demonstrate significant disagreement with this basic proposition, the absence of statistical data pointing to any other conclusions, and the accepted and widespread absorption of the polygraph into the operations of many government agencies, all confirm the Court's conclusion that the polygraph has been accepted by authorities in the field as being capable of producing highly probative evidence in a court of law when properly used by competent, experienced examiners.

■ Turning to the polygraph test in this case, the Court must consider the qualifications of Lt. Shoop and the manner in which he administered the examination to the defendant. The examiner's expertise is a most critical factor affecting the reliability and usefulness of a polygraph test.[27] In passing on Lt. Shoop's qualifications, his education, training and experience in the field of polygraphy have been noted and compared with the criteria expressed by the various experts heard by the Court.[28] He received training at the Polygraph Examiners School, Fort Gordon, Georgia in 1962 and has attended several advanced polygraph seminars since that time. He has administered approximately 2,000 polygraph examinations for the Metropolitan Police Department and at the request of several courts in the District of Columbia, our United States Attorney's Office, the Corporation Counsel's Office, the Federal Bureau of Investigation, and law enforcement agencies in Maryland and Virginia. Although he does not possess a college degree, his background, and the expertise which he demonstrated, convince the Court of his proficiency as a polygraph examiner.

The Government has chosen not to take issue with Lt. Shoop's qualifications, but has instead called into question the propriety of the examination which he administered. Specifically, it is claimed that the pre-test interview, the control questions, the length of the questions, and the number of tests were marked with irregularities which cast doubt on the usefulness of the results of the defendant's examination. These possible defects may have affected the acciracy of Lt. Shoop's diagnosis, but not so substantially that they are fatal. There is no question that the alleged flaws pressed by the Government can and should be taken into account by the jury in determining the weight which to accord Lt. Shoop's opinion. But in judging at what point a particular examination so deviates from accepted pro-

---

26. Transcript at 509–11. Dr. Orne also testified that although scientists today would not say that polygraph technique is ineffective, there is a great deal of controversy over such matters as the precise effectiveness of the technique, the kind of circumstances under which it works most reliably, and the underlying theory of its operation; that although most of his colleagues would agree that the detection of deception can be carried out reliably in the sense of being far better than chance, he did not believe that there is a solid body of opinion in the scientific community which has agreed upon the "validity" of the procedure. Transcript at 88–89. This statement concerning the "validity" of polygraph technique, in view of Dr.

Orne's repeated assertions of its basic effectiveness, and his estimate of its accuracy at 85 per cent, appears to have been aimed at the absence of absolute scientific verification of the matters in controversy referred to above. The Court is not concerned with satisfaction of this *scientific* standard of validity, but with the *legal* standard of whether there is agreement as to a degree of sufficient quality to assure probative value.

27. *See* People v. Davis, *supra* note 6, 72 N.W.2d at 282; Reid & Inbau, *supra* note 3, at 4, 235, 257.

28. Lt. Shoop's qualifications are generally set forth in the Transcript at 531–60.

cedure that it should be disallowed, the Court should carefully consider the judgment of the skilled examiner regarding the methods he has employed. In the instant case the record reveals that Mr. Shoop's conformity with standard practice was more than sufficient, and his explanations of deviations amply cogent to make his proposed testimony of significant value.[29]

While the Court has found the proffer of expert polygraph testimony in this case to be probative, this finding must be qualified by a weighing of the probative value of this evidence against the policy considerations which mitigate against its admission. The problem which has traditionally caused the courts the greatest concern in this regard is the possibility that the jury might consider the examiner's opinion to be so conclusive on the issue of guilt or innocence as to intrude upon and usurp its historical role and prerogatives.[30] The question is whether the feared tendency of the jury to attach exaggerated significance to the examiner's testimony can be controlled. Carefully conducted trial procedure can offer opportunities to alert the jurors to the value and limitations of polygraph technique. It is contemplated that the foundation for the examiner's opinion will be required to include sufficient information to enable the jury to make an intelligent evaluation. Vigorous cross-examination of the examiner and other expert witnesses will expose inadequacies which may have affected the results of a particular examination. Instructions to the examiner and to the jury can also clarify and distinguish the role that each is to play.[31] In the course of his testimony, the examiner will not be permitted to give an opinion on the issue of guilt or inno-

cence, but will be asked to assess the truthfulness of the defendant's answers to factual questions concerning the crime and to explain the basis for his opinion; that is, his analysis of the defendant's physiological responses to the questions. After considering the basis of the examiner's opinion and the other foundational material presented, the jury may perform its customary duty of attaching whatever significance to the opinion that it believes is warranted.

■■ In the final analysis, the determination of whether the proffer of polygraph testimony can be presented so that its value to the truth-finding process overcomes the danger of over-emphasis by the jury resides within the sound discretion of the trial judge. The court should ensure that the jury has been adequately prepared before it allows the examiner to state his conclusions. If these safeguards have been observed, the jury should be able to properly evaluate the polygraph evidence.

■ The task of educating and instructing the jury may consume considerable time and perhaps encumber it with auxiliary and complex matters. Such burdens on the judicial process must flow to some extent from a decision to accept polygraph testimony. The Court has carefully observed the comprehensibility and compressibility of the expert testimony in the course of the hearings before it and is of the opinion that the effects of these factors can be minimized at trial. The conclusion which the Court reaches is that the proffer of polygraph testimony here is both compatible with the system of trial by jury and possessed of a demonstrated evidential force which strikes the balance in favor of its admission.[32]

29. Transcript at 560–612.

30. *See, e. g.,* United States v. Stromberg, *supra* note 4, 179 F.Supp. at 280.

31. Analogous instructions defining the function of the expert witness and informing the jury with respect to the evaluation of expert testimony are commonly given in cases dealing with the insanity defense. *See, e. g.,* United States v. Brawner, ——

U.S.App.D.C. ——, 471 F.2d 969, at 1008, 1972; Washington v. United States, 129 U.S.App.D.C. 29, 42, 390 F.2d 444, 457 (1969).

32. It is interesting to note that in Frye the Government argued in its brief on appeal that: ·
  [t]he most serious objection to the admissibility of the testimony offered by

Accordingly, the Court holds that on the facts of this case, the requirements for the admission of expert testimony based on the results of the defendant's polygraph examination, as mandated by *Frye* and by the general rules of evidence, have been satisfied.[33]

appellant is that, if admitted, it would have invaded and trenched upon the function of the jury.

Brief for Appellee at 8, Frye v. United States, *supra.* The opinion of the court, however, made no comment in agreement with this position, but on the contrary, indicated that at some point "the evidential force of the principle must be recognized." Frye, *supra,* at 47.

33. This holding is necessarily delimited to situations in which admission is sought by the defendant of the results of a polygraph examination to which he voluntarily submitted. Circumstances in which the Government requests the admission of a test opposed by the defendant may involve constitutional questions concerning Fifth Amendment protections which were not before the Court in this case. Cf. Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (dictum).