[No. 2117-3. Division Three. August 22, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. ANGELO DENNY PLEASANT, *Appellant.*

*Christopher S. Tait* and *J. Adam Moore* (appointed counsel for appeal) and *Edward D. Seeberger,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* for respondent.

McINTURFF, J.—Angelo Denny Pleasant appeals convictions of first–degree murder and manslaughter in the shooting deaths of two Yakima teachers.

Mr. Pleasant, a stellar high school wrestler, was be–friended by Glynn Moore, a teacher and coach at a Yakima high school who persuaded Mr. Pleasant to attend that school to participate in its wrestling program. Following a divorce from his wife, Dee Ann, Mr. Moore became depressed and obsessed with the idea of reuniting with his former wife. However, she was living with Morris Blankenbaker, another Yakima high school teacher, to whom she had been married for several years prior to her marriage with Mr. Moore.

Believing that Mr. Blankenbaker was the sole obstacle to regaining favor with his ex–wife, Mr. Moore allegedly asked Mr. Pleasant, who was then a college student in Ellensburg, to kill Mr. Blankenbaker to clear the path to Dee Ann. In November 1975 Mr. Blankenbaker was killed outside his home after returning from work as a bouncer at a local tavern. Mr. Pleasant admits being at the scene of the shooting but claims it was done by his brother, Anthony, who also was a friend of Mr. Moore.

In December 1975 Mr. Moore sought to allay suspicion that he had a part in the Blankenbaker slaying. He also

desired to gain the sympathy of Dee Ann. Therefore, he allegedly asked Mr. Pleasant to wound him with the same weapon involved in the Blankenbaker death. Again, Mr. Pleasant admits being at the scene but blames the death of Mr. Moore on a Larry Lovato.

Following his arrest and after having been fully advised of his rights, Mr. Pleasant confessed to both killings. Tape recordings of both statements were played to the jury. Mr. Pleasant later recanted his stories of both slayings, testifying his brother shot Mr. Blankenbaker and Mr. Lovato killed Mr. Moore. Mr. Pleasant was given polygraph examinations regarding the homicides on three occasions, and his brother was tested once.

Counsel attempted to admit the results of the polygraph examinations given to Mr. Pleasant and his brother. Two polygraph experts agreed that the first two tests given to Mr. Pleasant were inconclusive. On the third, the Yakima police polygrapher, Sgt. Richard Nesary who administered all of the tests in question, admitted that it was not one of the best tests he had run, but he opined that Mr. Pleasant was not being deceptive when he said his brother killed Mr. Blankenbaker. The other witness, Dr. Stanley Abrams, a nationally recognized polygraphy expert, said the same third examination "was leaning very slightly in the truthful direction but only slightly as far as I was concerned, only slightly." He considered the results inconclusive.

On the test given to Anthony Pleasant, Sgt. Nesary said he was being deceptive when he denied shooting (and shooting at) Mr. Blankenbaker. Dr. Abrams said the test "was certainly in the direction of deceptive. It wasn't as high as I would like it to be to be quite sure of it but it was certainly in that direction." He added that he would want to perform a test on Mr. Pleasant's brother or see one run on him before he could give a definite opinion.

Feeling bound by precedent, the court refused to admit the results of the examinations because the State and Mr.

Pleasant had not stipulated to their admissibility.[1] Nonetheless, the court allowed Mr. Pleasant's counsel to make a lengthy offer of proof concerning polygraphy generally and the tests given to the Pleasant brothers specifically.

Mr. Pleasant's co–counsel have presented 20 assignments of error, 17 of which are argued in the spirit of *Anders v. California,* 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967), and *State v. Koehler,* 73 Wn.2d 145, 436 P.2d 773 (1968). In a pro se supplemental brief Mr. Pleasant raises six alleged errors.

The first question is whether the court erred in failing to sever the charges and grant separate trials on each slaying. Mr. Pleasant timely moved for severance pursuant to CrR 4.4[2] on the grounds joinder of both offenses would (1) require him to refute two sets of alibi witnesses (those of his brother and Mr. Lovato); (2) evidence of two killings

---

[1]*See State v. Young,* 87 Wn.2d 129, 131, 550 P.2d 1 (1976); *State v. Woo,* 84 Wn.2d 472, 473, 527 P.2d 271 (1974).

After Mr. Pleasant was given the third examination, defense counsel twice sought a stipulation from the prosecutor who refused. During the trial, the prosecutor offered to stipulate to an exam to be given by Dr. Abrams, but Mr. Pleasant refused. There is evidence that as a result of the examinations, Mr. Pleasant's brother also was arrested and charged with the murder of Mr. Blankenbaker. The charges were later dismissed without prejudice.

[2]The rule provides in pertinent part:
"(a) **Timeliness of Motion; Waiver.**
"(1) A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require. Severance is waived if the motion is not made at the appropriate time.
"(2) If a defendant's pretrial motion for severance was overruled he may renew the motion on the same ground before or at the close of all the evidence. Severance is waived by failure to renew the motion.
"(b) **Severance of Offenses.**
"(1) The court, on application of the prosecuting attorney, or on application of the defendant other than under section (a), shall grant a severance of offenses whenever before trial or during trial with consent of the defendant, the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense."

would double the passion engendered by evidence of a single slaying; and (3) joinder required him to limit his explanation of the relationship between himself and Mr. Moore in defending against the Moore shooting because if he showed the depth of his feelings for Mr. Moore, he would be helping the State to prove its theory that he killed Mr. Blankenbaker at Mr. Moore's request.

The rules regarding joinder of offenses are set out in CrR 4.3 and RCW 10.37.060.[3] The question of granting separate trials lies within the sound discretion of the trial court and will not be reversed unless there is a manifest abuse of that discretion.[4] Joinder will be upheld unless prosecution of all the crimes in a single trial will embarrass or confound the defendant in presenting separate defenses

---

[3]The court rule provides in pertinent part:

(a) **Joinder of Offenses.** Two or more offenses may be joined in one charge, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both:

(1) are of the same or similar character, even if not part of a single scheme or plan; or

(2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan;

(3) improper joinder of offenses or defendants shall not preclude subsequent prosecution on the same charge for the charge or defendant improperly joined.

RCW 10.37.060 provides:

When there are several charges against any person, or persons, for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments or informations the whole may be joined in one indictment, or information, in separate counts; and, if two or more indictments are found, or two or more informations filed, in such cases, the court may order such indictments or informations to be consolidated.

In *State v. Thompson,* 88 Wn.2d 518, 525, 564 P.2d 315 (1977), the court said CrR 4.3 did not supersede the statute and that the two were consistent with one another. The court also held that the rule gives the trial court as much discretion in matters such as joinder of offenses as does the statute.

[4]*State v. Thompson,* 88 Wn.2d 518, 525, 564 P.2d 315 (1977); *State v. McDonald,* 74 Wn.2d 563, 564, 445 P.2d 635 (1968); *State v. Courville,* 63 Wn.2d 498, 501, 387 P.2d 938 (1963).

or the defendant will be erroneously prejudiced by cumulative evidence and hostility engendered by the totality of the evidence presented.[5] However, where evidence of one crime would be admissible to prove an element of the second, joinder of the two crimes cannot be said to be prejudicial where the other statutory criteria are met.[6] "The test is whether the questioned evidence tends to establish motive, intent, absence of accident or mistake, common scheme or plan, or identity or presence", *State v. Kinsey,* 7 Wn. App. 773, 778, 502 P.2d 470 (1972).

Since the offenses are of the same or similar character and connected together or constituting parts of a scheme or plan, they are amenable to joinder pursuant to the court rule and statute. The question then is whether trying both in a single trial was unduly prejudicial to Mr. Pleasant.

Evidence of both deaths tends to establish the scheme or plan undertaken by Mr. Moore to eliminate Mr. Blankenbaker and regain the favor of his ex–wife. Evidence of the Blankenbaker death tended to establish a motive for the slaying of Mr. Moore on the theory that Mr. Pleasant shot Mr. Moore to keep him from revealing information concerning his involvement in the Blankenbaker murder. Likewise, evidence of the Moore slaying tended to show the furtherance of his plan to regain favor with Dee Ann. In addition, both were killed by shots fired from the same weapon which was obtained by Mr. Pleasant shortly before each death from his cousin. Since evidence of both slayings would have been admissible in a separate trial for either, there was no error in their joinder.

The second issue is whether the court erred in denying Mr. Pleasant's motion to suppress the taped confessions.

---

[5]*State v. Smith,* 74 Wn.2d 744, 755, 446 P.2d 571 (1968). *See also State v. Long,* 65 Wn.2d 303, 319, 396 P.2d 990 (1964); *State v. Brunn,* 145 Wash. 435, 260 P. 990 (1927).

[6]*State v. Slaney,* 68 Wn.2d 93, 411 P.2d 426 (1966); *State v. Hartnell,* 15 Wn. App. 410, 550 P.2d 63 (1976); *State v. Conley,* 3 Wn. App. 579, 476 P.2d 544 (1970).

He contends the statements were not voluntarily given because his will to resist and act freely and intelligently was overborne by actions of Yakima policemen. In particular Mr. Pleasant points to numerous contacts with officers prior to his arrest during which he was not advised of his Fifth Amendment rights. He argues that the steady extraction of information from him during those contacts with the police led to his arrest and formed the preliminary basis of his taped statements. He also suggests that the time between his arrest and his later statements was so excessive as to be considered overbearing. Finally, he contends he was induced to make those confessions by promises from two officers that they would escort him to prison if possible and that they would recommend he be allowed to continue his education in prison.

█ This court recently said in *State v. Riley,* 17 Wn. App. 732, 735, 565 P.2d 105 (1977):

> To be admissible, a confession must be voluntary; and the test is whether the officer's behavior overcame the defendant's will to resist and brought about an admission that was not freely self-determined. The probable truth or falsity of the confession is not to be considered. Whether a confession is free and voluntary is not determined by whether the officer's conduct is shocking or the confession is cruelly extorted, but whether it was extracted by any sort of threats, violence, or direct or implied promises, however slight. A confession that is the product of coercion, physical or psychological, is involuntary and not admissible.

(Citations omitted.)

We note first that none of the statements Mr. Pleasant allegedly made to the officers during their investigation—other than the confessions—were admitted against him at trial. Nor were they made under circumstances which could be considered custodial. In regard to the statements admitted at trial—his taped confessions—we have thoroughly examined the record of the suppression hearing and have listened to the tapes. Each confession was made after about 2 hours of questioning on successive mornings following Mr.

Pleasant's arrest. Each is preceded by warnings as to the full panoply of Fifth Amendment rights. There is nothing in the statements or in the record of the suppression hearing to suggest the statements made by Mr. Pleasant were anything but freely, intelligently and voluntarily given. In fact, during the hearing he denied the detectives had made promises to him.[7] Under those circumstances the court did not err in admitting the taped confessions.

Mr. Pleasant next assigns error to the court's failure to admit the results of the polygraph examinations given to him and his brother.

In *State v. Woo*, 84 Wn.2d 472, 475, 527 P.2d 271 (1974), the court said:

> If we are to consider a departure from a virtually unanimous rule against the admissibility of polygraph examinations, absent stipulation, we must be furnished with a record sufficiently adequate to permit review of the subject.

The court indicated the following matters would be relevant in determining whether unstipulated polygragh results would be admissible:

> There is nothing to disclose whether there exists even minimum accepted qualifications for polygraph operators. If standards do exist, one is left to speculate as to what they are. There is nothing in the records, by way of testimony or exhibit, concerning the trustworthiness of the most modern polygraph. equipment. The type of equipment proposed to be used in the instant cases and its reliability are not disclosed. Further, the records are silent as to techniques to be used in the examinations and whether they are professionally acceptable.

---

[7]The record shows the following:

Q  Angelo, prior to you giving your statements to them, did either Detective Henderson or Sgt. Brimmer promise you anything other than that they would recommend to whomever that you get a chance to complete your education?

A  Promise?

Q  Promise you anything? Other than promise you that if you weren't guilty and you could help them, they would prove who was guilty?

A  I would have to say no to that.

Q  They didn't give you any promises?

A  Yes, I would have to say no, not that I can remember.

*State v. Woo, supra* at 474–75. Later, in *State v. Young,* 87 Wn.2d 129, 131–32, 550 P.2d 1 (1976), the court said:

> Upon examining the record made by the appellant in the case before us, we find it insufficient to support a reconsideration of the rule [against the admissibility of polygraph results absent stipulation]. Those factors which were mentioned as significant in *State v. Woo, supra,* were not covered in the appellant's offer of proof. We are not shown what the tests consisted of, what the qualifications of the examiners were, what the standards were which they followed, and what evidence there is of reliability.

We appreciate the reluctance of the court to depart from the almost overwhelming rule against the admissibility of polygraph evidence without stipulation between the parties. This is an area of the law fraught with sensitive emotional and policy considerations and long scarred with legal and scientific battles. Furthermore, neither *State v. Woo, supra,* nor *State v: Young, supra,* clearly establishes precisely what an offer of proof must contain before the rule against admissibility of polygraph results will be reexamined. Both cases refer only generally to issues which must be addressed, and neither opinion specifies the reason for the rule in this jurisdiction.

Generally, evidence of polygraph examinations is excluded on the grounds the technique has not attained general scientific acceptability.[8] That approach is not with-

[8]The genesis for that line of reasoning is *Frye v. United States,* 293 F.2d 1013, 1014 (D.C. Cir. 1923), where the court said:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well–recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*
>
> We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.

(Italics ours.) That reasoning retains as much force today as it did then. See, for example, the well written and researched opinion of Gibson, C.J., in *United*

out its critics.[9] Furthermore, there is a slight, but percepti-
ble, trend towards the admission of such evidence under

---

*States v. Alexander,* 526 F.2d 161, 170 (8th Cir. 1975), which concludes:

> Based upon the conclusion that the polygraph does not presently command general scientific acceptance and has not been shown to be sufficiently reliable, the District Court did not err in refusing to admit the unstipulated polygraph evidence.

[9]*See, e.g., United States v. Zeiger,* 350 F. Supp. 685 (D.D.C.), *rev'd,* 475 F.2d 1280 (D.C. Cir. 1972); *United States v. DeBetham,* 348 F. Supp. 1377 (S.D. Cal. 1972), *aff'd,* 470 F.2d 1367 (9th Cir. 1972). Those cases consider the "general scientific acceptance" requirement to be an artificially high standard for admissibility of polygraph evidence. They prefer the view taken in E. Cleary, *McCormick's Handbook of the Law of Evidence* § 203, at 491, and § 207, at 506–07 (2d ed. 1972), where the author says, respectively:

> "General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts used this approach, instead of repeating a supposed requirement of "general acceptance" not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances.
>
> . . .
>
> In the numerous opinions and the large commentary, the principles underlying the test, the qualifications and procedures of the polygraph operator, and the considerable statistics developed concerning the technique, have been subjected to a more searching and critical analysis than that accorded to any other form of evidence considered in this chapter. Neither the concessions of critics that its accuracy in the detection of insincerity is of the order of 70 percent or more, nor the widespread use of and reliance upon it in police investigation, business, industry, and government, nor the persistent efforts of trial courts to make some use of the evidence, have made any inroads on that position.
>
> As suggested in a previous section [quoted from above], the explanation can scarcely be found in any serious contention that even the opinion of a qualified expert in the field throws no light on the question of whether relevant statements made by a party or witness were sincere or not. *The exclusion seems to rest more upon a judicial estimate of the weight that the trier of fact will give to the opinion, and a demand that the opinion be almost infallible because the trier will think it so.*

(Footnotes omitted; italics ours.)

In regard to the concern of the courts about the impact of polygraph evidence on the jury compare the remarks of the court in *United States v. Alexander,* 526 F.2d 161, 169–70 (8th Cir. 1975):

> The extent to which the polygraph evidence may tend to pervade the fact-finding process in a jury trial and the probable effect that such evidence may have upon jurors may be some of the reasons underlying judicial reluctance to admit the results of unstipulated polygraph tests. The need for caution and

narrowly prescribed standards.[10] One thing is certain: The state of polygraphy has advanced considerably since it was

> careful reflection by the courts on this matter is particularly mandated when consideration is given to the many factors that may produce erroneous polygraph results and the likelihood that the polygraphist's mistaken conclusion as to a defendant's veracity will result in a miscarriage of justice.

and *State v. Conner,* 241 N.W.2d 447, 459 (Iowa 1976):

> Furthermore, the breadth, sensitivity and importance of the inference from polygraph evidence demands a higher standard of trustworthiness than is required of other kinds of scientific evidence. . . . In a field where so much depends on subjective analysis by the machine operator and the outcome of trial may well turn on the polygrapher's opinion, we believe a strong showing of scientific acceptance and evidentiary reliability must be made.

(Citations omitted.) with the comments of the courts in *United States v. DeBetham,* 348 F. Supp. 1377, 1390–91 (S.D. Cal. 1972):

> The apparent argument is that the traditional role of the jury as the sole judges of credibility would be rendered meaningless, since once the jurors hear the expert testimony of the polygraph expert they will arguably give conclusive weight to his opinion, despite any limiting instructions to the contrary. The underlying assumption, of course, is that the traditional manner of determining credibility is the only proper method. This is contrary, however, to the belief of Dean Wigmore, who in 1923 declared: "If ever there is devised a psychological test for the evaluation of witnesses, the law will run to meet it." Wigmore, Evidence (2d ed. 1923) § 875.

(Footnote omitted.) and in *United States v. Ridling,* 350 F. Supp. 91, 98 (E.D. Mich. 1972):

> The argument that the jury will be displaced by a machine or by a polygraph examiner lacks merit. The jury will make the final determination of guilt or innocence. In this connection it is important to understand how different juries are today than they were when the restrictive rules of evidence were first developed. On the whole they read widely. Largely because of television they know generally what is going on in the world. Their educational background is extensive. They think. They reason. They are really very good at sorting out good evidence from bad, of separating the credible witness from the incredible, and of disregarding experts who attempt to inject their opinions into areas of which they have little knowledge. They would welcome all evidence having a bearing on the problem they are deciding and the give and take of deliberation would expose weaknesses in any witness or evidence. A modern jury, that must deliberate, and must agree, is the ideal body to evaluate opinions of this kind. The search for truth should be enhanced, eliminating some cases in which both sides agree there is no real issue, and in other cases assisting the jury to reach a just result.

> We note in oral argument to this court the prosecutor conceded one of the reasons he refused to stipulate to the admissibility of the polygraph examinations was his fear of the jury's reaction to them.

[10]*See, e.g., State v. Dorsey,* 87 N.M. 323, 532 P.2d 912 (1975), *aff'd,* 88 N.M. 184, 539 P.2d 204 (1975); *Commonwealth v. A Juvenile,* 365 Mass. 421, 313 N.E.2d 120 (1974); *United States v. Ridling,* 350 F. Supp. 91 (E.D. Mich. 1972).

first denied legal respectability 50 years ago.[11]

Our problem here is in attempting to evaluate Mr. Pleasant's offer of proof against the backdrop of *Woo* and *Young*, the steadfast reluctance of the courts to acknowledge polygraph evidence, the wealth of materials available on the subject,[12] and, of course, the facts and circumstances of the case before us. The examinations of Mr. Pleasant and his brother take on special significance because, despite the existence of circumstantial evidence to support the conviction, the critical issue at trial was Mr. Pleasant's credibility. At first, he confessed to both killings. Then he recanted his stories, blaming the Blankenbaker death on his brother. The results of the polygraph examinations—without regard to the legal questions concerning their admissibility—support the recantations. Because of the special significance attached to the Pleasant brothers' polygraph examinations and the likelihood of future cases involving similar questions, we turn in detail to the offer of proof regarding those tests.

Mr. Pleasant's offer of proof contained substantial testimony concerning the reliability of polygraph examinations

---

[11] "Most legal scholars agree that the Frye [*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)] court was justified in excluding lie detector results from evidence. The year was 1923, and the science of polygraphy was in its infancy." Comment, *United States v. Ridling: The Polygraph Breaks the "Twilight Zone,"* 23 Cath. U. L. Rev. 101, 111 (1973). However, even courts which deny the admission of polygraph evidence because it has not met the general scientific acceptance, have noted the evolution of the polygraph. *See, e.g., State v. Conner,* 241 N.W.2d 447, 459 (Iowa 1976):

> We recognize that substantial advances have been made in the science of polygraphy. These advances are reviewed in the cases which have held polygraph evidence admissible. Too, we are aware of the widespread use and reliance on the polygraph in government and commerce for investigative purposes. See 20 Drake L.Rev. 330, 343–347 (1971).

[12] A partial list of cases, texts and commentary dealing with polygraphy in the law is appended to this opinion. Representative of the contrasting legal points of view are *United States v. Alexander,* 526 F.2d 161 (8th Cir. 1975) (denying admissibility for failure of the polygraph to attain general scientific acceptability) and the District Court opinion in *United States v. DeBetham,* 348 F. Supp. 1377 (S.D. Cal. 1972) (denying admissibility only because of applicable precedent within the circuit but preferring admission as opinion evidence).

generally.[13] The qualifications of Sgt. Nesary were adequately covered,[14] and the court was informed of the step-by-step examination process involving the Pleasant brothers.[15] Sergeant Nesary testified as to the questions he asked the brothers,[16] but we are not furnished with their answers to all of the questions nor were the charts of each

---

[13]Dr. Abrams was asked how accurate polygraph tests were. He answered:
I did a review of the literature which appeared in the Journal of Forensic Sciences in 1973. I surveyed probably every study that had ever been done in both laboratory and in field situations as actual criminal investigations. The findings were that in the laboratory the average—this included the very poor studies—the average accuracy was 83%, which is understandably smaller than what occurs in real life. In the laboratory situation they use volunteer subjects who have absolutely nothing to lose if their lie is detected so obviously the fear level is quite low. Excuse me. The result is that they are more difficult to detect in a lie but 83% is very impressive. Some studies have gone up to a hundred percent however.

In direct contrast to this, when any research is done in the real life situation, the reports are that 95% accuracy is attained; however, you have to recognize that in actual crime situations complete verification from some outside objective source isn't always attained, in fact it's only attained in about 60% of the cases but in those 60%, 95% accuracy is attained, 90 to 95, and another two to seven percent inconclusive results are attained.

[14]Sergeant Nesary attended the National Training Center of Lie Detection in New York City for 6 weeks in 1969. Following completion of the course, he was required to send his first five exams to the center and five of the next 30 he gave. In addition, he returned to the center a year later for a further week's training before he was certified by the school. He testified he attended at least two polygraph training sessions each year since then. He said he performed 1,800 examinations.

The Yakima police polygrapher for several years, Sgt. Nesary has been with the police department for 19 years. He also is in charge of the records bureau. He said he has testified as a polygrapher for both the State and the defendant in several cases where the parties have stipulated to the admissibility of the polygraph results.

[15]The essential operation of the polygraph technique is set out in several texts and cases. See, e.g., Seattle Police Officers' Guild v. Seattle, 80 Wn.2d 307, 323-24, 494 P.2d 485 (1972) (Rosellini, J., dissenting). See also J. Reid & F. Inbau, Truth and Deception (1966).

[16]Mr. Pleasant was asked the following questions: Do you live in the United States? Are you completely convinced that I will not ask you a question during this chart that has not already been reviewed? Besides sports, is it true before you were 20 you can't remember deliberately hurting anyone? Did Anthony shoot Morris Blankenbaker? Before you were 20, do you remember lying to get someone

examination offered into evidence.[17] While there was testimony that 19 other states have adopted standards for polygraph examiners, there was no evidence as to general standards required of them or their examination process,

---

in trouble? Did anyone besides Anthony shoot Morris Blankenbaker? Is there something else you are afraid I will ask you a question about even though I told you I would not?

His brother was asked: Do you live in the United States? Are you completely convinced that I will not ask you a question during this chart that has not already been reviewed? Before you were 18, do you remember deliberately hurting anyone? Did you shoot Morris Blankenbaker? Is there something else you are afraid I will ask you a question about even though I told you I would not?

Sergeant Nesary and Dr. Abrams explained that the detection of deception or truthfulness involves a comparison of the examinee's responses to questions designed to elicit a probable lie (*i.e.,* Before you were 18, do you remember lying to get someone in serious trouble?) with questions directed to the specific subject in question (*i.e.,* Did you shoot Morris Blankenbaker?). The responses in terms of blood pressure, respiration and galvanic skin response (essentially the presence or absence of perspiration in the palm of the hand) are recorded by pens marking on a continuously moving sheet of paper (chart).

[17]Mr. Pleasant's counsel said during the offer of proof that they made a conscious decision not to admit the charts. In response to a question by the prosecutor concerning the charts, Mr. Pleasant's counsel said:

If Mr. Sullivan wants them admitted, we have no objection. We just don't care particularly whether they are or not. We don't feel that that's an area we have to explore to make this record. If Mr. Sullivan wants to go into it, of course, he's free to.

The leading proponents of admitting polygraph evidence suggest that courts require, among other things, production of the charts for cross-examination purposes. J. Reid & F. Inbau, *Truth and Deception* 275 (1966). *See also United States v. DeBetham,* 348 F. Supp. 1377, 1386 (S.D. Cal. 1972), which quotes approvingly from the Reid and Inbau text.

The production of the charts in Mr. Pleasant's case could be particularly helpful because Dr. Abrams and Sgt. Nesary each use a different technique for reading the charts, and there is some disagreement between them as to the conclusiveness of the examinations. Even assuming that polygraph results would be admissible without stipulation between the parties, the presence of the charts in cases such as this would enable the trial court to determine whether the results would be conclusive enough for presentation to the jury. *See State v. Carr,* 13 Wn. App. 704, 707, 537 P.2d 844 (1975), where the court said:

As our Supreme Court in *State v. Woo, supra* [84 Wn.2d 472, 527 P.2d 271 (1974)], we, in this case, do not reach the ultimate question of whether in all circumstances polygraph testing cannot be used as an aid in judging witness credibility. *But, even assuming the validity of polygraph testing for truthfulness, it was not error to exclude the evidence in this case because of the polygraph operator's conclusion that the test which he had given was inconclusive.*

particularly within the state of Washington. While the machine used by Sgt. Nesary was identified and considered to be operating accurately, there is no testimony as to its reliability or the reliability of the specific testing procedures he used.[18] Finally, there is nothing to show the trustworthiness of the most modern polygraph equipment.[19]

Under those circumstances and on the basis of *Woo* and *Young,* we must consider Mr. Pleasant's offer of proof inadequate for a proper review of the subject. That is so regardless of whether our court adheres to the traditional reason for excluding polygraph evidence (lack of scientific

---

(Italics ours.) In that case the polygraph operator testified he could not render an opinion as to the truthfulness of the victim's answers because of the victim's physical conditions. He had taken methadone 30 minutes before the test, was suffering from a headache, cold, and respiratory disorder from a gunshot wound and "discomfort from suspected gonorrhea." He also appeared to be under the influence of drugs.

Notably absent in Mr. Pleasant's offer of proof is evidence concerning the condition of the Pleasant brothers at the time of their examinations.

[18]On the question of the machine's reliability, we are not furnished with evidence concerning the accuracy of its detection of changes in the physiological responses monitored by its sensors.

As to the specific testing procedure used by Sgt. Nesary we note the first two examinations given to Mr. Pleasant were "KLT type tests and a verification test." Although the experts agreed the results of those tests were inconclusive, there is nothing in the record to explain what type of test the KLT is. On the two tests offered, Mr. Pleasant and his brother were given Backster Zone Comparison Tests which, according to Sgt. Nesary, involve asking the same question two different ways, *i.e.,* Did you shoot Morris Blankenbaker? Did you shoot at Morris Blankenbaker?

Presumably the Backster type tests are a variation on the theme—probable lie questions are still compared to relevant, crime questions. Nonetheless, there is nothing in the record concerning why that type of test was administered, whether, in fact, it is a variation of the principal testing technique and whether and to what extent it is reliable.

[19]Trustworthiness of the most modern polygraph equipment was a factor considered significant by the court in *Woo*. It could mean the offer of proof must contain evidence to establish that the most modern equipment accurately records the examinee's physiological responses during the examination. On the other hand, it could mean that an offer of proof must contain evidence to establish that the most modern polygraph equipment is capable of accurately detecting truth or deception—a throwback to the "general scientific acceptance" requirements of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). In either case, there is no evidence on that point.

acceptance) or prefers the evolving approach that polygraph results be treated as other opinion evidence.[20] Thus, the court did not err in refusing to admit the results of the polygraph examinations given to the Pleasant brothers absent a stipulation as to their admissibility.

We have thoroughly reviewed the record and have carefully examined the remaining assignments of error. Considered singly or cumulatively, we find them to be without prejudicial effect. Nonetheless, we must say, in regard to Mr. Pleasant's pro se contention that he was denied adequate assistance of counsel, that the case was excellently tried by the court and all counsel. Every safeguard was employed to insure Mr. Pleasant was fairly and competently tried.

Judgment of the Superior Court is affirmed.

MUNSON, C.J., concurs.

### APPENDIX

#### Cases

For a variety of cases from other jurisdictions see the cases cited in the opinion. *See also Physiological or Psychological Truth and Deception Tests*, Annot., 23 A.L.R.2d 1306 (1952) and *Admissibility of Lie Detector Test Taken Upon Stipulation That the Result Will Be Admissible in Evidence*, Annot., 53 A.L.R.3d 1005 (1973).

#### Texts

N. Ansley, *Legal Admissibility of the Polygraph* (1975).
R. Ferguson, *Polygraph for the Defense* (1974).
R. Ferguson & A. Miller, *The Polygraph in Court* (1973).
R. Ferguson, *The Scientific Informer* (1971).
J. Reid & F. Inbau, *Truth and Deception* (1966).

---

[20]The author of this opinion believes our courts should carefully scrutinize the prevailing authorities on the subject and exercise the judicial independence for which the Washington courts are noted. The remarks of Tauro, C.J., in *Commonwealth v. A Juvenile*, 365 Mass. 421, 435, 313 N.E.2d 120, 129 (1974), are apropos:

The argument is made that only a few jurisdictions have seen fit to admit polygraphic evidence. I agree that it is much easier to wait until the majority of the States have done the arduous spadework in resolving novel, difficult, and complex questions of law, and then fall in line. However, our preference should be to work out our own destiny.

Commentary

M. Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am. Crim. L. Rev. 29 (1977).

R. Axelrod, *The Use of Lie Detectors by Criminal Defense Attorneys,* 3 Nat. J. of Crim. Def. 107 (1977).

S. Abrams, *Polygraphy Today,* 3 Nat. J. of Crim. Def. 85 (1977).

Note, *Polygraphy: Short Circuit to Truth?,* 29 U. Fla. L. Rev. 286 (1977).

C. Menard, *The Polygraph: A Critical Appraisal,* 50 Fla. Bar. J. 147 (1976).

M. Forkosch, *The Lie Detector and Mechanical Jurisprudence,* 28 Okla. L. Rev. 288 (1975).

B. Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid to Determining Credibility in a Perjury–Plagued System,* 26 Hast. L.J. 917 (1975).

R. Pino, *The Polygraph as a Dispositional Aid to the Juvenile Court,* 9 New Eng. L. Rev. 311 (1974).

Note, *Pinocchio's New Nose,* 48 N.Y.U.L. Rev. 339 (1973).

Comment, *The Polygraph: Scientific v. Judicial Acceptance,* 27 U. Miami L. Rev. 254 (1972).

Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie Detection,* 70 Yale L.J. 694 (1961).

Wicker, *The Polygraphic Truth Test and the Law of Evidence,* 22 Tenn. L. Rev. 711 (1953).

GREEN, J. (concurring in the result only)—As to the polygraph issue, I concur in the result only. The product of a polygraph test is inadmissible unless stipulated to by both the defense and the prosecution. *State v. Ross,* 7 Wn. App. 62, 69, 497 P.2d 1343, 53 A.L.R.3d 997, *review denied,* 81 Wn.2d 1003 (1972). Here, the parties did not stipulate to the polygraphs; hence, they were inadmissible.

Reconsideration denied September 7, 1978.

Review denied by Supreme Court January 19, 1979.